**In re McDONNELL DOUGLAS CORPO-
RATION SECURITIES LITIGATION.**

No. 81–170C(3).

MDL No. 448.

United States District Court,
E.D. Missouri, E.D.

June 22, 1982.

Sherrie R. Savett, Berger & Montague, Philadelphia, Pa., for plaintiff.

Veryl L. Riddle, St. Louis, Mo., for McDonnell Douglas Corp.

Robert S. Allen, St. Louis, Mo., for all other defendants.

MEMORANDUM

HUNGATE, District Judge.

This matter is before the Court on plaintiffs' motion for class action certification pursuant to Rule 23(c) of the Federal Rules of Civil Procedure. The Court held a hearing on the motion on March 25, 1982.

Plaintiffs allege that defendants violated section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78a et seq.) and Rule 10b–5 (17 C.F.R. § 240.10b–5) promulgated by the Securities and Exchange Commission. Plaintiffs are purchasers of McDonnell Douglas Corporation (MDC) common stock and call options. Plaintiffs' amended complaint alleges two claims. The first claim is that defendants failed to disclose to the investing public certain material adverse information relating to the business, finances, and operations of MDC. The second claim is that the individual defendants sold shares of MDC stock while possessing the undisclosed material information.

For the reasons stated below, the Court grants plaintiffs' motion and certifies a class.

The class sought to be certified is: all open market purchasers similarly situated, during the period commencing January 2, 1980, through April 21, 1980 (the "class period"), of MDC common stock and certain call options to purchase MDC common stock expiring during May, August, and November, 1980. The relevant call options are those call options expiring in May and August, 1980, with exercise prices between $25 and $50 per share and call options expiring in November, 1980, with exercise prices between $35 and $50 per share. Excluded from the class are the Estate of James S. McDonnell, the individual defendants herein, members of the immediate family of each defendant or James S. McDonnell, deceased, any entity in which any of the defendants or the Estate of James S. McDonnell has a 51% interest, and the legal representatives, heirs, successors, or assigns of any of the defendants and James S. McDonnell, deceased.

■ Before turning to the specific allegations of plaintiffs' complaint and the factual background of the certification motion, it should be noted that the merits of plaintiffs' claims are not now before the Court. *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1974). Therefore, the summary of facts set forth below, based on the allegations in plaintiffs' amended complaint and the evidence presented at the March 25, 1982, hearing, are limited only to the context of this motion. Generally, in determining class action certification, the Court will take the substantive allegations of plaintiffs' complaint as true. *Hochschuler v. G.D. Searle & Co.,* 82 F.R.D. 339, 342 (N.D. Ill.1978); *Blackie v. Barrack,* 524 F.2d 891, 901 n. 17 (9th Cir.1975), *cert. denied,* 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976).

*Factual Summary*

Plaintiffs allege that on or about January 27, 1980, MDC reported its extremely favorable 1979 earnings, including the fourth quarter results. The fourth quarter earnings were reported to be up 18% on increased sales of 14% over the previous quarter. Profits for 1979 were reported to be up 24% over 1978 on a 28% increase in sales. MDC also announced an increase in its cash dividend to $.22½ per share, up from $.18¾ per share.

Plaintiffs further allege that, commencing by at least January 1, 1980, the financial and operating conditions of MDC were deteriorating in the following ways:

1. MDC was sustaining a serious cash drain as indicated by the fact that at June 30, 1980, its cash position had declined to $73,000,000 from $327,000,000 at December 31, 1979, and $623,000,000 at September 30, 1979.

2. The program for the DC–9 Super 80 series aircraft, of critical importance to MDC's commercial strength, was incurring sharply increased development and production startup costs. The DC–10 commercial aircraft, critical to MDC's commercial profitability, was sustaining

drastic cuts in production rate and a material decline in orders.

3. Military production was also incurring marked cost increases. The Air Force's KC–10 tanker/cargo aircraft, a modified version of the commercial DC–10, began to sustain material cost increases in part as a result of the falling DC–10 production rate.

4. The cost of completion of KC–10 contracts and foreign DC–10 support contracts and the start-up production and development costs of the DC–9 Super 80 series aircraft had or would sharply exceed prior cost estimates.

The amended complaint then alleges that MDC and the individual defendants, who were officers and directors of MDC during the first quarter of 1980, knew of this adverse information, failed to disclose it, and engaged in a common course of conduct which operated as a fraud or deceit upon plaintiffs. Plaintiffs also allege that the individual officers and directors violated the "disclose or abstain" rule, *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir.1968), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), by selling shares of MDC stock without disclosing the adverse information referred to above.

On or about April 21, 1980, MDC publicly announced its first quarter results indicating that operating earnings had fallen about 40% from 1979, and that the development and start-up costs on the DC–9 Super 80 series aircraft, as well as the production costs for the KC–10, had increased substantially during the first quarter. Earnings fell even though sales were up from the prior year. Plaintiffs allege that these disclosures caused a sharp drop in the price of MDC stock.

Plaintiff Epstein bought six August 50 call options of MDC stock for $3,116.52 on February 4 and February 6, 1980, through the Pacific Exchange. This gave him the right to buy 600 shares of MDC stock for $50 per share at any time before the end of August, 1980. Epstein held these options until they expired.

Plaintiff Pearlman bought the following shares of MDC common stock through the New York Stock Exchange:

| Date of Purchase | Quantity & Price | Amount Paid |
|---|---|---|
| Feb. 15, 1980 | 100 at 48–¼ | $4,406.73 |
| March 18, 1980 | 100 at 37–⅝ | 3,792.50 |
| April 15, 1980 | 100 at 36 | 3,630.00 |
| April 17, 1980 | 200 at 33–⅝ | 6,760.22 |

*Discussion*

Plaintiffs seek certification of a class pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure.

All of the following requirements of Rule 23(a) must be satisfied by the proponent of certification:

One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

The plaintiffs here must also satisfy Rule 23(b)(3), which states as follows:

[T]he court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

(1) *Numerosity.* The proposed class plainly meets the first requirement that it is so numerous that joinder is impracticable.

Plaintiffs claim that approximately 9,000,000 common shares were traded in the open market, and that approximately 90,000 call options were purchased on the Pacific Exchange during the proposed class period. The parties estimate that there would be between 15,000 and 40,000 class members. *See* 7 Wright & Miller, Federal Practice and Procedure, Civil § 1762. *E.g., Piel v. National Semiconductor Corp.,* 86 F.R.D. 357, 365 (E.D.Pa.1980).

(2) *Common Questions of Law and Fact.* Subsections (a)(2) and (b)(3) of Rule 23 require the existence of common questions of law or fact among the class. Subsection (b)(3) dictates that the court find that common questions predominate over questions affecting only individual members.

There is little question that Rule 23(a)(2) is satisfied here. There are common questions about whether information was withheld, its materiality, and whether there was a common course of conduct to withhold. Further, whether the alleged non-disclosed facts were publicly disseminated and whether the market price of the stock was artificially inflated also present common questions. *See, e.g., Dura-Bilt Corp. v. Chase Manhattan Corp.,* 89 F.R.D. 87, 93 (S.D.N.Y.1981); *Hochschuler v. G.D. Searle & Co., supra; Re Penn Cent. Secur. Litigation,* 347 F.Supp. 1327 (E.D.Pa.1972), *mod.,* 357 F.Supp. 869 (1973), *aff'd,* 494 F.2d 528 (3d Cir.1974).

Defendants vehemently contest plaintiffs' characterization that common questions predominate over individual ones. They claim that individual questions predominate primarily for the following reasons:

(a) The facts allegedly withheld by defendants were not discrete events. They were various business conditions that would vary significantly throughout the class period. For example, the financial impact of production cost increases for a particular plane would have been the result of a variety of factors, estimates, and accounting decisions.

(b) Determination of each defendant's knowledge, scienter, and duty to disclose

at the time of each alleged insider sale would be necessary.

(c) Each class member must show reliance, causation, and damages.

(d) In an insider trading case, an inside seller can only be liable to "contemporaneous" purchasers of MDC stock. Therefore, a plaintiff who purchased MDC stock well after a defendant's sale, but before disclosure, may not recover damages based on that sale. This could create numerous groups of contemporaneous purchasers competing for damages from defendants.

■ Generally, in determining whether common questions predominate, courts focus on the liability issues as opposed to individual questions such as reliance on damages. *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 456 (3d Cir.1977), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978); *Dura-Bilt Corp. v. Chase Manhattan Corp., supra* at 93; 1 Newberg on Class Actions §§ 1155 and 8824(b) (1977).

Defendants' first contention is that the constantly changing conditions of MDC require complicated factual determinations to establish liability for each alleged insider sale. Other courts have addressed similar issues. For example, the defendants in *Dura-Bilt, supra,* argued that various disclosures "created a continuously changing factual mix of available information." *Id.* at 94. Therefore, the *Dura-Bilt* plaintiffs asserted, the materiality of alleged inside information would present substantial individual questions. Defendants here assert that in addition to materiality, the knowledge, scienter, and duty to disclose of each defendant would depend on different factual circumstances. For similar arguments, *see Blackie v. Barrack, supra; Gelman v. Westinghouse Electric Corp.,* 73 F.R.D. 60 (W.D.Pa.1976), *aff'd by an evenly divided court,* 612 F.2d 799 (3d Cir.1980).

Defendants also allege that these individual questions create irreconcilable conflicts between class members. For example, a plaintiff that purchased MDC stock early in the class period would have no incentive to

prove facts that occurred after their purchase.

The Court, after careful consideration, finds defendants' arguments unpersuasive. Plaintiffs have a common interest in determining whether a defendant's conduct is actionable in general. *See Blackie v. Barrack, supra* at 902. This is especially true when plaintiffs allege a common course of conduct by defendants. *Id.* at 903; *Harris v. Palm Springs Alpine Estates, Inc.,* 329 F.2d 909, 914 (9th Cir.1964); *Hochschuler v. G.D. Searle & Co., supra* at 349. Plaintiffs will attempt to show that each defendant failed to disclose material information about MDC's financial status. In other words, it is a common interest of plaintiffs as a class to show defendants' knowledge of material undisclosed facts before the beginning of the class period, or early in it.

With regard to conflicts among plaintiffs, the Court agrees with the following words of Judge Edelstein:

Defendants' argument assumes that a named plaintiff will not be motivated to prove fraud after the date of his purchase. However, the class representatives purchased ... stock on a number of dates between May 5 and May 29. The complaint alleges a common course of conduct, namely, selling stock without disclosing material information, which began prior to the first purchase of the class representatives and continued until the last purchase. In such 'cases, the weight of authority holds that a plaintiff may represent subsequent purchasers. In alleging a common course of conduct, the plaintiffs will have a sufficient incentive to fully develop the facts which occurred after their own purchases.

*Dura-Bilt Corp. v. Chase Manhattan Corp., supra* at 100.

■ In an open market fraud case involving alleged omissions of material facts, individual questions of reliance, causation, and damages do not defeat class action certification. The amount of damages is nearly always an individual question and can usually be determined by the application of a mechanical formula. *Blackie v. Barrack,*

*supra* at 909; *Hochschuler v. G.D. Searle & Co., supra* at 349. If, as the case develops, it becomes apparent that nature of the damages remedy creates possible conflicts among plaintiffs or causes other difficulties, the Court can address those issues later. *See, e.g., Blackie v. Barrack, supra* at 909 (potential conflicts caused by determination of appropriate measure of damages can be resolved by the creation of subclasses); *Elkind v. Liggett & Myers, Inc.,* CCH Fed.Secur.L.Rep. ¶ 96,602 at 94,569 (S.D.N.Y.1978), later opinion *see* 635 F.2d 156 (2d Cir.1980) (referring to magistrate for determination of each individual's damages).

Reliance, causation, and materiality in securities fraud actions are interrelated.

The roots of the causation in fact requirement have been the subject of much disharmony. Causation has been most often analyzed in terms of the Rule 10b–5 elements of materiality or reliance. *See, e.g., Affiliated Ute Citizens v. United States,* [406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972)], ... (materiality); *List v. Fashion Park, Inc.,* [340 F.2d 457, 462 (2d Cir.), *cert. denied,* 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965)] (reliance). The materiality element requires the plaintiff to show that the misrepresentation or omission would likely have influenced in reasonable or objective contemplation the seller's decision to sell. *Cf. TSC Industries v. Northway, Inc.,* 426 U.S. 438, 449 [96 S.Ct. 2126, 2132, 48 L.Ed.2d 757] ... (1976). The element of reliance traditionally required proof that the misrepresentation or omission actually induced the plaintiff to act differently than he would have acted in his investment decision. *See Myzel v. Fields,* 386 F.2d 718, 735 (8th Cir.1967), *cert. denied,* 390 U.S. 951 [88 S.Ct. 1043, 19 L.Ed.2d 1143] ... (1968). However, in *Affiliated Ute Citizens v. United States, supra,* 406 U.S. at 153–154 [92 S.Ct. at 1472], ... the Supreme Court held that when a Rule 10b–5 violation involves a failure to disclose, positive proof of reliance is not a prerequisite to recovery. The Court said:

All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision. This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact.

*Id.* at 153–154 [92 S.Ct. at 1472], ... (citations omitted); *see also Chasins v. Smith, Barney & Co.,* 438 F.2d 1167, 1172 (2d Cir.1970). However, the consensus of authority, to which we ascribe, has declined to read into *Affiliated Ute Citizens* a conclusive presumption of reliance in all nondisclosure cases in which materiality has been established. *See Rochez Bros., Inc. v. Rhoades,* 491 F.2d 402, 410 (3d Cir.1974); *Carras v. Burns,* 516 F.2d 251, 257 (4th Cir.1975); *Chelsea Associates v. Rapanos,* 527 F.2d 1266, 1271–1272 (6th Cir.1975). As the Third Circuit said in *Rochez Bros., Inc. v. Rhoades, supra,* 491 F.2d at 410:

> We do not read this decision to say that the question of reliance *vel non* may not be considered at all in a nondisclosure case, but only that proof of reliance is not required for recovery. If defendant is able to demonstrate that there was clearly no reliance, that is, that even if the material facts had been disclosed, plaintiff's decision as to the transaction would not have been different from what it was, then the non-disclosure cannot be said to have caused the subsequent loss and under the ordinary principles of the law of fraud, recovery should be denied. However, in light of the Supreme Court's holding in *Affiliated Ute,* the burden of proof rests squarely upon the defendant to establish the "non-reliance" of plaintiff. (Citation omitted.)

*See also Carras v. Burns, supra,* 516 F.2d at 257; *Chelsea Associates v. Rapanos, supra,* 527 F.2d at 1271–1272.

*St. Louis Union Trust Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 562 F.2d 1040, 1048–49 (8th Cir.1977) (some citations omitted). *See Vervaecke v. Chiles, Heider & Co.,* 578 F.2d 713 (8th Cir.1978).

In light of the above analysis, many courts have held that questions of materiality, causation, and reliance are common questions. *E.g., Ross v. A.H. Robins Co.,* 607 F.2d 545 (2d Cir.1979), *cert. denied,* 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980); *Blackie v. Barrack, supra; Dura-Bilt Corp. v. Chase Manhattan Corp., supra; Hochschuler v. G.D. Searle & Co., supra.*

Defendants' fourth argument is based on several cases in the Second Circuit. In *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 495 F.2d 228, 241 (2d Cir.1974), the court held that "defendants are liable in this private action for damages to plaintiffs who, during the same period that defendants traded in or recommended trading in ... [the] stock, purchased [the] stock in the open market without knowledge of the material inside information which was in possession of the defendants." The period of non-disclosure involved was four days. Similarly, the Second Circuit allowed open market purchasers to recover from corporate insiders or their tippees who traded on the basis of non-disclosed information during a two-day period of insider or tippee trading. *Elkind v. Liggett & Myers, Inc.,* 635 F.2d 156, 165 (2d Cir.1980). The court recently denied standing to an investor who alleged insider selling without disclosure of material information because his purchase of stock in the company was not contemporaneous with the insider sales, even though the alleged material information was not disclosed until after plaintiff's purchases. *Wilson v. Comtech Telecommunications Corp.,* 648 F.2d 88 (2d Cir.1981). Approximately one month had elapsed between defendant's sales and plaintiff's purchases. The court found support for its decision in its *Shapiro* and *Elkind* decisions. *Id.* at 94–95.

The Eighth Circuit has not addressed the contemporaneous transaction issue, although it has recognized that a plaintiff must show a causal nexus between a defendant's wrongful conduct and plaintiff's loss in order to recover for securities fraud under § 10(b) and Rule 10b–5. *St. Louis*

Union Trust Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., supra at 1048. The precise causal nexus that should be required in this case is not clear. Whether the contemporaneous transaction rule of Wilson v. Comtech Telecommunications Corp., supra, should be applied, and if so, its precise parameters, is more appropriately determined after further development of the record in this case. For example, the facts relevant to the alleged common course of conduct could easily be important to establishing the causal nexus between defendants' conduct and plaintiffs' losses. This issue is, therefore, a common question that affects the liability and damages of all class members.

The Court, after careful consideration, concludes that common questions predominate over individual ones within the meaning of Rule 23(b)(3), Fed.R.Civ.P.

(3) *Typicality.* The typicality requirement overlaps with the common question requirement of Rule 23(a)(2) and the adequate representation requirement of Rule 23(a)(4). Generally, a named plaintiff's claim meets the typicality requirement if it arises from the same act or course of conduct by defendants that comprises the basis for the claims of other class members and the claims have the same legal basis. *Dura-Bilt Corp. v. Chase Manhattan Corp., supra* at 99; *Green v. Wolf Corp.,* 406 F.2d 291, 299 (2d Cir.1968), *cert. denied,* 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969). Therefore, the class representative will further the interests of the class by pursuing his or her own interest. Defendants argue that the named plaintiffs' interest must be co-extensive and compatible with those of other class members. This is an overstatement.

> Rule 23(a)(3) does not require that the claims of the representative parties and the remaining members of the class be identical. The crucial inquiry is whether the potential conflict of interest is minimal and outweighed by the existence of substantial questions common *to all members* of the class.

Byrnes v. IDS Realty Trust, 70 F.R.D. 608, 611 (D.Minn.1976).

Defendants argue that the interests of the named plaintiffs are antagonistic to the interests of other members of the class for several reasons. First, since a purchaser may only recover from an insider on the basis of the insider's prior sale, the named plaintiffs have no interest in representing a plaintiff who purchased late in the class period. Defendants also argue that the same conflict is created by the contemporaneous transaction rule and the possible competition for a limited pool of damages. Defendants raised the same arguments in the context of the predominance of common questions. The Court's analysis in that context applies equally here. *See Blackie v. Barrack, supra* at 909–11. The court in *Dura-Bilt Corp. v. Chase Manhattan Corp.* countered similar arguments by defendants:

> [A] difference in the amount of damages, date, size, or manner of purchase, the type of purchaser, and even the specific document influencing the purchase will not render the claim atypical in most securities actions. *See Oscar Gruss & Son v. Geon Industries, Inc.,* 75 F.R.D. 531, 534–35 (S.D.N.Y.1977); *Clark v. Cameron-Brown Co.,* 72 F.R.D. 48, 52–54 (M.D.N.C.1976); *Epstein v. Weiss,* 13 F.R. Serv.2d 562, 567 (E.D.La.1970). Plaintiffs here satisfy the typicality requirement by showing that the same allegedly unlawful conduct affected the named plaintiffs and the class members, notwithstanding the existence of some potential conflict of interest due to the differing purchase dates.

*Dura-Bilt Corp. v. Chase Manhattan Corp., supra* at 99–100 (some citations omitted).

Defendants also argue that the named plaintiffs are atypical because they are subject to factual defenses peculiar to them. *See J.H. Cohn & Co. v. American Appraisal Associates, Inc.,* 628 F.2d 994, 998–99 (7th Cir.1974); *Koos v. First Nat. Bank,* 496 F.2d 1162, 1164–65 (7th Cir.1974); *Greenspan v. Brassler,* 78 F.R.D. 130 (S.D.N.Y.1978). The Court in *Greenspan* found plaintiffs' claims atypical in an open market fraud case be-

cause there was evidence that the named plaintiffs did not rely on the integrity of the market but on the recommendation of another. The reason given for this requirement is that the time and effort spent devoted to the peculiar defenses will detract from the case of the other class plaintiffs. *Koos v. First Nat. Bank, supra* at 1165.

In support of their position that plaintiff Roger Pearlman is not a typical investor, defendants point to the facts that Pearlman is a sophisticated professional investor that relied on a detailed analysis of MDC, including an examination of various articles in magazines and investment publications. Defendants also claim that Pearlman knew of the conditions that are the subject of the complaint before his purchases during the class period through his examination of the various publications. With regard to plaintiff Robert Epstein, defendants rely on the facts that he is an account executive at a brokerage house, relied on his own technical analysis and was aware that his firm recommended MDC stock as a buy.

■ The Court, after careful consideration, finds that Epstein's and Pearlman's sophistication as investors, and their analyses of MDC do not make them atypical plaintiffs. Many investors perform various degrees and types of investigation and analysis before buying a particular stock or option. In this Court's view, variations in the degree of investigation or sophistication of analysis do not significantly alter a plaintiff's typicality in an open market fraud case such as this one, when plaintiffs examined public documents in the course of their independent analysis and claim that undisclosed information resulted in inflated stock prices. The situation would be different if, for example, there was evidence that an insider disclosed material information to a named plaintiff. Furthermore, defendants' arguments that plaintiffs, through their examination of published materials, knew of the financial conditions that were allegedly not disclosed during the class period, do not necessarily support the contention that plaintiffs are atypical. If the non-disclosed information was in fact adequately disclosed to the public, the argument that there was therefore no securities fraud would apply to the plaintiffs as a class; it would be a common question. The Court, therefore, is not convinced that the facts surrounding the purchases by plaintiffs Pearlman and Epstein make them so subject to unique defenses that they would detract substantially from the case of the other class plaintiffs.

Defendants also assert that plaintiff Epstein's claims are not typical because the purchase of call options is fundamentally different from the purchase of common stock. Call option purchasers may purchase for diverse investment purposes such as leverage potential or to hedge a short position. Defendants further argue that the price of a stock and the value of an option do not move together, creating potentially different interests between call option purchasers and stock purchasers.

■ Defendants' arguments are cogent but unconvincing. Initially, it should be noted that call options are a security for purposes of § 10(b) and Rule 10b–5. *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 751, 95 S.Ct. 1917, 1932, 44 L.Ed.2d 539 (1975); *see O'Connor & Associates v. Dean Witter Reynolds, Inc.,* 529 F.Supp. 1179 (S.D.N.Y.1981) (options trader has standing to allege securities fraud under § 10(b) based on insider and tippee trading). The class plaintiffs who purchased call options during the class period have the same overriding common interest in establishing the existence and materiality of the alleged omissions during the class period and proving defendants' liability. Any differences based on the time of purchase would create the same potential conflicts that the Court addressed earlier. Additionally, any variation in damages based on the differences in price movement that may arise can be addressed later if liability is established through, for example, the creation of subclasses. *See, e.g., Fischer v. Kletz,* 41 F.R.D. 377 (S.D.N.Y.1966) (possible conflict between common stockholders and debenture holders could be addressed by creation of subclasses).

(4) *Superiority.* Rule 23(b)(3) requires that the maintenance of a class action be superior to other available methods of adjudication. The alternatives usually considered by courts are the maintenance of individual actions, individual actions with joinder of other class members, and the use of a test case. *Dura-Bilt Corp. v. Chase Manhattan Corp., supra* at 103; *Hochschuler v. G.D. Searle & Co., supra* at 350. Given the large number of potential class members whose claims are probably too small to warrant individual suits, the Court finds the maintenance of a class action is superior to the alternatives.

Defendants also raise the related issue of manageability of the class action. Defendants base their claim that this action is unmanageable on vague assertions such as that certification will create a "Frankenstein Monster" and will be a substantial drain on the resources of this Court. Contrary to defendants' attacks, the Court finds that the management problems that may be created by this class action are not insurmountable. The Court's control over the action, through careful oversight at every stage of the proceedings and application of the Federal Rules of Civil Procedure, and the principals embodied in the Manual for Complex Litigation, will minimize administrative and management problems.

In conclusion, having considered the arguments, pleadings, briefs, affidavits, depositions, and other materials presented by the parties, as well as the applicable law, the Court finds that plaintiffs can proceed in this cause as a class action. Plaintiffs have met the requirements of Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure. The Court, of course, can alter or amend this certification if warranted by later developments.

## ORDER

A memorandum dated this day is hereby incorporated into and made a part of this order.

IT IS HEREBY ORDERED that plaintiffs' motion for class action certification pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure be and the same is granted. The class shall consist of all open market purchasers similarly situated, during the period commencing January 2, 1980, through April 21, 1980, of MDC common stock and certain call options to purchase MDC common stock expiring during May, August, and November, 1980. The relevant call options are those call options expiring in May and August, 1980, with exercise prices between $25 and $50 per share and call options expiring in November, 1980, with exercise prices between $35 and $50 per share. Excluded from the class are the Estate of James S. McDonnell, the individual defendants herein, members of the immediate family of each defendant or James S. McDonnell, deceased, any entity in which any of the defendants or the Estate of James S. McDonnell has a 51% interest, and the legal representatives, heirs, successors, or assigns of any of the defendants and James S. McDonnell, deceased.