Milton **FISHER**, Plaintiff,

v.

The **PLESSEY COMPANY LIMITED** and **Plessey Incorporated, Defendants.**

**No. 82 Civ. 1183 (WCC).**

United States District Court, S.D. New York.

Sept. 21, 1984.

Wolf, Popper, Ross, Wolf & Jones, New York City, for plaintiff; Robert M. Kornreich, Eric L. Keisman, New York City, of counsel.

Satterlee & Stephens, New York City, for defendants; James F. Rittinger, Barbara L. Wartelle, New York City, of counsel.

## OPINION AND ORDER

CONNER, District Judge.

Plaintiff Milton Fisher ("Fisher") brought this action against The Plessey Company Limited ("Plessey Ltd.") and its subsidiary Plessey Incorporated ("Plessey Inc.") alleging violations of federal securities laws in connection with Plessey Ltd.'s 1980 tender offer for Plessey Inc. debentures. In an Opinion and Order dated March 15, 1983, 559 F.Supp. 442, familiarity with which is presumed, the Court denied defendants' motion for summary judgment on those claims asserted under Section 10(b) of the Securities Exchange Act of 1934 ("the Act") and regulations promul-

gated thereunder.[1] In a subsequent Opinion and Order dated June 21, 1983, the Court also denied defendants' motion to dismiss claims founded upon Section 13(e) of the Act. The matter is now before the Court on plaintiff's motion for class certification pursuant to Rule 23, F.R.Civ.P. For the reasons below, the motion is granted.

*Background*

The facts germane to the class certification issue are substantially similar to those set forth in the Court's previous Opinions, and can be stated briefly. In March 1980, Plessey Ltd., an English public limited company, commenced a tender offer for the 4½% convertible subordinated debentures of its wholly-owned American subsidiary, Plessey Inc. The debentures were traded on the American Stock Exchange and were convertible into American Depository Receipts ("ADR"s) at a rate of 14.3711 ADRs per each debenture with a face value of $1,000. These ADRs, which are traded on the New York Stock Exchange, each represent ten ordinary shares of Plessey Ltd. Thus, the price of Plessey Inc. debentures is related to the price of Plessey Ltd. ordinary shares.

According to the complaint, the conversion value of each $1,000 debenture immediately before the tender offer was $417, based upon a market price of $29 per ADR. Under the terms of the offer, Plessey Ltd. agreed to pay a cash price of $585 per debenture. The offer expired on April 30, 1980.

Fisher, who tendered debentures in the face amount of $15,000 on April 28, 1980, alleges in essence that the tender offer was the culmination of a fraudulent and deceptive scheme to eliminate the publicly held debentures at a grossly unfair price. He contends that the tender offer documents[2]

were misleading in that defendants: failed to provide factual information reflecting substantial anticipated increases in Plessey Ltd.'s fourth-quarter profits; failed to provide certain financial information required by Section 13(e) of the Act; and failed to report the development of an important new product, the sale of two unprofitable subsidiaries, and an expected increase in orders, all of which improved Plessey Ltd.'s market position. Moreover, Fisher charges that defendants falsely stated that the offer was fair and that, aside from the historical price information presented about the ADRs, there was no information material to a decision whether to tender the debentures. This conduct, according to plaintiff, violated the anti-fraud provisions of the Act and also constituted a breach of fiduciary duties.

Fisher now seeks certification of a class consisting of "all holders of the Debentures, similarly situated, who were such holders on March 18, 1980, the date of the commencement of the Tender Offer, and who tendered and sold their Debentures pursuant to that Tender Offer."[3] Complaint at ¶ 7(b). He asserts that this case satisfies the class certification prerequisites of Rule 23(a), including numerosity, commonality, typicality and adequacy of representation. He also contends, as he must to satisfy the requirements of Rule 23(b)(3), that common questions of law and fact predominate over individual questions and that a class action is superior to other available methods of adjudicating the controversy. Not surprisingly, defendants vigorously challenge plaintiff's assessments of the propriety of class certification. Their specific objections are discussed below.

---

**1.** The Court denied defendants' motion for summary judgment in all respects but one. The Court granted the motion insofar as it addressed plaintiff's claim that defendants should have disclosed predictions of fourth-quarter earnings.

**2.** The tender offer documents include the Offer to Purchase, the Issuer Tender Offer Statement and the Transaction Statement. The Offer to Purchase was mailed to Fisher and other debenture holders, while the other two documents were filed with the Securities and Exchange Commission.

**3.** The proposed class expressly excludes "the defendants and the officers, directors, members of their respective immediate families, and affiliates of the defendants." Complaint at ¶ 7(b).

*Discussion*

Defendants do not deny that joinder would be impractical in light of the proposed class membership, nor do they suggest that there are no questions of law or fact common to the class. Rather, defendants' attack on the class certification effort focuses principally on plaintiff's contentions that common questions of law and fact predominate over individual questions, and that plaintiff is an adequate class representative.

■■■ As plaintiff's lawsuit is founded primarily upon an alleged violation of Rule 10b–5, analysis of the predominance of common questions issue begins with a description of the elements of a 10b–5 cause of action. In order to prevail at trial, whether on behalf of himself or as a class representative, plaintiff must demonstrate that: (1) defendants made a material misstatement or omitted to state a material fact in connection with the purchase or sale of securities; (2) defendants acted with the requisite scienter; (3) plaintiff relied on such statements or omissions; and (4) plaintiff suffered damage as a result. *Rosenbloom v. Adams, Scott & Co.*, 521 F.Supp. 372, 379 (S.D.N.Y.1981). A 10b–5 action obviously raises questions of fact and law common to the claims of all potential class members, particularly with respect to the elements of materiality and scienter. The more difficult issue is whether common questions predominate.

In support of their position that individual questions predominate, defendants argue first that prior to commencement of the tender offer, there was widespread publication of the data allegedly omitted from the relevant documents, and that various debenture holders therefore possessed different information. Defendants suggest that they were not obligated to disclose information already available to the debenture holders, and that "in order for the court to determine if any material misrepresentations have been made it will be necessary to determine which plaintiffs had knowledge of the matters allegedly omitted from the tender documents." Defendants' Mem. at 16. Defendants rely on a line of cases establishing that there is "no duty to disclose information to one who reasonably should be aware of it," *id.* at 13, but this reliance reflects defendants' misunderstanding of the nature of the materiality inquiry.

■■■ The materiality of a statement or an omission is measured in terms of its market impact; the concept "focuses on the weightiness of the misstated or omitted fact in a reasonable investor's decision to buy or sell." *Chris-Craft Industries, Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 362 (2d Cir.), *cert. denied*, 414 U.S. 910, 94 S.Ct. 232, 38 L.Ed.2d 148 (1973). Because the materiality test is concerned not with whether the investment decision of a particular individual would have been affected, but only "whether a prototype reasonable investor would have relied," *id.* at 363, the standard for resolving the materiality issue is obviously objective and general rather than subjective and individual. Thus, for purposes of this inquiry, materiality presents an issue common to all members of the proposed class. *See Dura-Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87 (S.D.N.Y.1981) (materiality a common issue); *In re McDonnell Douglas Corp. Securities Litigation*, 98 F.R.D. 613, 620 (E.D.Mo.1982) ("If the non-disclosed information was, in fact, adequately disclosed to the public, the argument that there was therefore no securities fraud would apply to the plaintiffs as a class; it would be a common question.")[4]

■■■ Defendants also suggest that because most of the facts allegedly omitted from the tender documents were publicized through other means, each plaintiff will be

---

**4.** It should be noted that the issue of prior publicity presents a common issue with respect to the scienter element as well as the materiality element. Presumably, defendants will escape liability if they can demonstrate a good faith belief that all of their debenture holders were aware of the omitted information, and that disclosure in the tender documents was therefore unnecessary.

required to demonstrate that he remained unaware of the information and was actually misled by the omissions. Defendants assert that individual questions arising in connection with proof of the reliance element will therefore predominate over common questions, and the class should not be certified. Fisher correctly points out, however, that existence of the reliance element is presumed without positive proof where, as here, the alleged violation consists of withholding material information.[5] *See Affiliated Ute Citizens v. United States,* 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972) (Obligation to disclose and withholding of material fact sufficient to establish causation in fact). *See also Dura-Bilt,* 89 F.R.D. at 96–97. Thus, a presumption of reliance by all class members will arise upon plaintiff's showing of materiality and non-disclosure, and, notwithstanding the fears expressed by defendants, individual questions will not abound.

◼ Of course, defendants may seek to rebut a presumption of reliance by demonstrating that individual debenture holders had access to and knowledge of the omitted information, and therefore placed no reliance on the tender documents. While such a defense would indeed give rise to individual questions, the Court will not deny plaintiff's motion on that basis. If every defendant in a securities fraud action were permitted to defeat class certification efforts merely by asserting an intention to rebut the presumption of reliance by demonstrating that some of the omitted information was available to and may have been considered by an undetermined number of potential class members, the class action device would be rendered useless. If necessary, the Court can hold separate hearings ᵒon the issue of reliance. *See Green v. Wolf Corporation,* 406 F.2d 291, 301 (2d Cir.1968), *cert. denied,* 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969) (Even if proof of individual reliance necessary, argument that individual questions therefore predominate "would negate any attempted class action under Rule 10b–5, since ... reliance is an issue lurking in every 10b–5 action." No reason why trial court cannot order separate trials on reliance issue if necessary); *see also Dura-Bilt,* 89 F.R.D. at 98 (If reliance must be proven, court can order separate hearings).

◼ Defendants argue next that individual questions of reliance will arise at trial because of defendants' contention that even if the omitted information had been provided, the terms of the offer were such that any reasonable investor would have tendered his debentures in order to purchase ADRs.[6] According to defendants, each debenture holder will be required to demonstrate that he had some unique or peculiar reason for preferring debentures to ADRs before liability can be imposed. To the extent that defendants do hope to demonstrate that no prudent investor would have declined to tender his debentures, they must address their proof not to the reliance issue but to the threshold materiality question. In other words, if the omitted information would not have been a factor in the decision of an objective reasonable debenture holder, the omission was not material and there can be no liability.

5. Various courts have recognized that most misrepresentations can be restated as allegations of nondisclosure. *See, e.g., Dura-Bilt Corp. v. Chase Manhattan Corp.,* 89 F.R.D. 87, 97 (S.D.N.Y.1981). In a case such as this, where the only alleged misstatements reflect defendants' beliefs that the offer was "fair," Complaint at ¶ 15, and that there was no undisclosed information material and relevant to the transactions, Complaint at ¶ 18, the distinction between misstatements and omissions is negligible.

6. The gist of defendants' argument is that the tender offer presented debenture holders with an opportunity to convert their debentures to cash at a rate higher than the market price. With this premium, a debenture holder could purchase more ADRs than he would have been entitled to receive under the conversion feature of the debentures. Thus, defendants assert that if the holder had known the omitted information, he would have concluded that the price of Plessey Ltd. shares was on the rise, and would have tendered his debentures in order to purchase more ADRs with the proceeds. Def.Mem. at 17–18.

If, on the other hand, plaintiff can demonstrate that the omitted information was material, the presumption of reliance once again operates in his favor, and defendants are faced with the task of establishing that the omitted information would not have influenced specific individuals. The task is not an enviable one, but it faces all 10b–5 defendants once the presumption of reliance arises, and it will not preclude class certification here.

 In general, courts determining whether common questions predominate "focus on the liability issues as opposed to individual questions such as reliance and damages." *Dura-Bilt,* 89 F.R.D. at 87, 93; *In re McDonnell Douglas,* 98 F.R.D. at 616; 1 Newberg on Class Actions §§ 1155 and 8824(b) (1977). Given the broad remedial objectives of the Act, and keeping in mind that predominance does not require identity of issues, 89 F.R.D. at 93–94, I find that those questions of law and fact which are common to all potential class members predominate over those affecting only particular individuals. Therefore, I decline to refuse certification on the ground that this requirement of Rule 23(b)(3) is not met.

 Defendants' next objection to certification rests on Rule 23(a)(4), which provides that a class action may be maintained only if the putative representative can "fairly and adequately protect the interests of the class." This determination generally involves consideration of such issues as whether class counsel are experienced and qualified to represent the class, whether the class representative will vigorously pursue the claims of all members, and whether the representative has interests antagonistic to those of other members. Defendants concentrate their arguments on what they perceive to be antagonism between the interests of Fisher and other class members.[7]

With respect to the claim based upon failure to disclose fourth-quarter profit data, defendants argue that since plaintiff did not tender his own shares until two days before the offer expired, he will have "little incentive to establish that defendants had any obligation to make known the fourth-quarter results prior to the date of his tender." Def.Mem. at 22. Defendants contend further that they received fourth-quarter results in their rawest form on April 10, 1980,[8] and that because 85% of the debenture holders had tendered before that date, "the interests of the vast majority of the proposed class will not be adequately represented by plaintiff." *Id.* at 22–23. As authority for this conclusion, defendants cite a variety of cases in which judges of this Court have found conflicts between the interests of a named plaintiff and those of proposed class members who purchased or sold their securities before the plaintiff. For the following reasons, I am unpersuaded by defendants' arguments.

---

**7.** The considerations relevant to this issue generally overlap with those determinative of whether plaintiff's claims and defenses are typical of the claims and defenses of other class members. *See* Rule 23(a)(3); *Dura-Bilt,* 89 F.R.D. at 99. I note, in passing upon the merits of defendants' "adequacy of representation" and "typicality" protestations, the skepticism with which such arguments are often greeted. In *Fox v. Prudent Resources Trust,* 69 F.R.D. 74, 79 (E.D.Pa.1975), the Pennsylvania district court observed that "in class action suits it is always rather anomalous that defendants should concern themselves with the adequacy of plaintiff's representation of the class." The same court stated in *Umbriac v. American Snacks, Inc.,* 388 F.Supp. 265, 275 (E.D.Pa.1975):

It is in the nature of motion practice on class action determination issues that defend-

ants, who naturally have no interest in the successful prosecution of the class suit against them, are called upon to interpose arguments in opposition to class determination motions verbally grounded upon a concern for the "best" representation for the class, while the implicit, but nonetheless real objective of their vigorous legal assault is to insure "no" representation for the class.

**8.** Defendants state in their initial brief that April 10th was the date they received the fourth-quarter results "in their rawest form." Def.Mem. at 22. In the reply brief, on the other hand, defendants inexplicably announce that April 8th was the date the raw figures arrived. Plaintiff undoubtedly derives some satisfaction from defendants' apparent inability to pinpoint the date on which this crucial event occurred.

**158**

The theory underlying plaintiff's claim for relief is that defendants were well aware that fourth-quarter profits would increase substantially, and that they concocted a scheme to consummate the tender offer prior to the publication of information signaling or reflecting these gains. In order to persuade a jury that such a scheme existed, Fisher's incentive will be to establish that fourth-quarter results, or at least substantially reliable preliminary earnings reports, were first available prior to the effective date of the tender offer. It may be true, of course, that the information was not in a form appropriate for disclosure until just before Fisher's tender; if this is so, some class members will be unable to recover on their fourth-quarter-profit claims. Nevertheless, the Court will not assume the merits of defendants' assertions for purposes of the class certification issue. Fisher should not be deprived of an opportunity to try to show, on behalf of others as well as himself, that the April 10 date is inaccurate. Moreover, there is no reason to believe that a hypothetical individual who tendered earlier will more skillfully be able to investigate and elicit at trial the facts necessary for this determination.

The cases cited by defendants for the proposition that there is an "inherent antagonism" between the interests of a named plaintiff and earlier purchasers or sellers are inapposite. These decisions rest on the fact that a variety of misrepresentations were allegedly made *during* the relevant period, and that individuals who purchased or sold later in the period were interested in emphasizing the significance of later misrepresentations while at the same time minimizing the effects of earlier statements. Courts have often certified classes where various individuals purchased or sold at different times but in reliance on similar misrepresentations.

See, e.g., *Green v. Wolf Corp.*, 406 F.2d 291, 299 (2d Cir.1968), *cert. denied*, 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969); *Dura-Bilt*, 89 F.R.D. at 100. Because information omitted from defendants' tender documents forms the only basis for Fisher's claims, and because these documents were presumably available to all potential members, there is no reason to believe an "inherent antagonism" exists in the present case.[9]

Defendants also challenge plaintiff's ability adequately to represent the damage claims of other class members. This argument, which presupposes favorable resolution of several outstanding issues, proceeds as follows: All omitted information except that related to the fourth-quarter results was publicly disclosed prior to the tender offer. Under the "efficient market theory," all information publicly disclosed was instantly absorbed into the market price for the debentures, and the market price therefore reflected the "real" value of the debentures, except, of course, insofar as the fourth-quarter results were not considered. Damages are calculated by subtracting the price paid from the real value, and because the tender price here was greater than the market or real value, those members of the class who have no claim based upon the fourth-quarter profits because they tendered prior to April 10, 1980, when defendants received the fourth-quarter data in its rawest form, suffered no damage. Thus, if defendants are successful in demonstrating that there was no duty to disclose previously publicized information, only those holders who tendered after defendants' duty to disclose fourth-quarter profits arose will have viable claims. Because plaintiff is among those who tendered after April 10, 1980, and his claim would therefore remain viable, his interests are antagonistic to those of the

---

**9.** Defendants argue that due to the publication of news stories and press releases, there was variation in the information relied upon by different debenture holders. However, insofar as they contend that these news releases relieved them of any obligation to provide the information in the tender documents, they are effective-

ly implying that all of the disclosures occurred *before* the tender documents were issued. Therefore, this factor will not support the argument that Fisher's interests are antagonistic simply because he tendered later in the relevant period.

vast majority who tendered earlier. Def. Mem. at 26–28.

■ The logic of this argument is not apparent. Even assuming, *arguendo*, that there was wide dissemination of the omitted information prior to the tender offer, that the "efficient market theory" is valid, that an out-of-pocket measure of damages is more appropriate than a measure of damages based on defendants' gains, and that defendants' obligation to disclose fourth-quarter profit information only arose on April 10, plaintiff's interests are in no way antagonistic to the interests of class members whose claims may prove meritless. Had Fisher tendered before April 10, defendants would have a plausible claim that he is unable adequately to represent the entire class because he is at risk of having all his claims eliminated. To say that he is not an adequate representative because his claim is less vulnerable than those of others is to stand a logical argument on its head. Indeed, if all of defendants' arguments prevail and only the fourth-quarter-profit claim remains, Fisher's last-minute tender may make him the best possible representative because he will be among the last to be eliminated. Thus, I conclude that plaintiff's interests are not antagonistic to those of the potential class members.

■ Defendants next attack plaintiff's "typicality"; Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims and defenses of the class." Generally, a plaintiff's claim meets the typicality requirement if it "arises from the same event or course of conduct that gives rise to claims of other class members and the claims are based on the same legal theory." *Dura-Bilt*, 89 F.R.D. at 99. Rule 23(a)(3) reflects primarily a concern that the success of a class action not be compromised by a diversion of attention from the substance of the basic claim. Courts have also used the requirement to assure that class recovery is not imperiled by the existence of a defense uniquely available against the named representative. *Kline v. Wolf*, 88 F.R.D. 696, 700 (S.D.N.Y.1981); *Lewis v. Johnson*, 92 F.R.D. 758 (E.D.N.Y.1981). Defendants assert that Fisher is subject to two such unique defenses, and therefore, that the class should not be certified.

The first of these defenses is that of non-reliance. During a deposition, Fisher admitted that prior to tendering his debentures, he did not examine the Issuer Tender Offer Statement or the Transaction Statement, both of which had been filed with the Securities and Exchange Commission ("SEC") pursuant to Section 13(e) of the Act and Rules 13e–3 and 13e–4 promulgated thereunder. Fisher Dep. at 52–55. He testified that he neither read nor relied upon the information in either of those documents, and that he reviewed only the Offer to Purchase, which he received in the mail. Fisher Dep. at 51.

■ If this were a case in which documents filed with the SEC contained all of the material information allegedly omitted from a document sent directly to a security holder, the Court might be required to determine whether the security holder was under an obligation to inspect the SEC documents. If there were such an obligation, a plausible argument could be made that a putative class representative who failed to conduct such a review would be subject to a unique defense. In the present case, however, plaintiff asserts that all three tender documents were deficient in the same respects.[10] This means that if Fisher had examined the SEC documents, he would have encountered precisely the same alleged misstatements and omissions he found in his Offer to Purchase. Thus, his reliance was no different from that of debenture holders who re-

---

**10.** Plaintiff contends that none of the documents contained the financial information required by Section 13(e) of the Act, and Rules 13e–3 and 13e–4, promulgated thereunder. Rule 13e–3 and Rule 13e–4 require that specific information be provided to both the SEC and the security holder. *See, e.g.,* 17 C.F.R. §§ 270.-13e–3(d); 270.13e–3(e); 270.13e–4(c); 270.13e–4(d).

viewed the SEC documents as well as the Offer to Purchase.

The second unique defense to which Fisher is allegedly subject is the "sophisticated investor" defense. Defendants contend that because plaintiff was trained as a lawyer, works in investment banking, reads the *Wall Street Journal* and "owns many types of securities," he qualifies as a sophisticated investor who may be held to a higher standard on the issue of justifiable reliance. Defendants express concern that "the issue of plaintiff's sophistication could well usurp a substantial portion of time and energy in this litigation," and therefore they urge that certification be denied. Def.Mem. at 32–33.

The Court does not share this concern. Although defendants are not without support for the proposition that a court may decline to certify a class when it believes that the named representative's status as a sophisticated investor might render him atypical and thereby jeopardize class recovery, courts in this Circuit have frequently found that sophisticated investors are suitable class representatives. *See, e.g., Wilson v. Great American Industries, Inc.*, 94 F.R.D. 570 (N.D.N.Y. 1982); *Koenig v. Smith*, 88 F.R.D. 604, 607 (S.D.N.Y.1980) (Defendant failed to show that plaintiff's sophistication rendered his claim atypical); *Feder v. Harrington*, 52 F.R.D. 178, 184 (S.D.N.Y.1970) ("If the plaintiffs are correct in claiming that the defendants omitted to state material facts from the tender letter, the omitted information was no more available to brokers and large investment institutions than it was to the small investor."). The arguments raised by defendants with respect to Fisher's investment acumen are simply insufficient to preclude class certification.

Defendants' final effort to defeat the motion for class certification consists of an appeal to the Court's obvious interest in avoiding a "totally unmanageable proceeding." Def.Mem. at 33. Class actions, by their nature, raise substantial management problems. Nonetheless, having determined in this case that questions common to all potential class members predominate over individual questions, and that the other specific requirements of Rule 23 are met, the Court will not balk at the prospect of administrative difficulties. As the Court of Appeals for the Second Circuit recognized in *Green v. Wolf Corporation*, 406 F.2d 291 (2d Cir.1968), *cert. denied*, 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969), class actions such as this might place additional burdens on judges,

> but the alternatives are either no recourse for ... stockholders to whom the courthouse would thus be out of bounds or a multiplicity and scattering of suits with the inefficient administration of litigation which follows in its wake.

*Id.* at 301 (footnote omitted). I have concluded, pursuant to Rule 23(b)(3), that a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

For all the foregoing reasons, this action may be maintained as a class action. Of course, under Rule 23(c)(1), this determination will be subject to alteration or amendment, and the class will even be subject to decertification, if it becomes apparent during the course of discovery or litigation that the matter is unmanageable as a class action or that the certification motion was improvidently or prematurely granted.

Counsel are directed to appear at a pretrial conference on October 12, 1984 at 2 P.M., in Room 608, to discuss provisions for notice to the class members and the conduct of discovery.

SO ORDERED.