**Catherine M. SMITH, Plaintiff,**

v.

**MCI TELECOMMUNICATIONS CORPORATION, Defendant.**

Civ. A. No. 87–2110–O.

United States District Court,
D. Kansas.

Feb. 23, 1989.

668

Robert P. Numrich, Martha Madden Weast, Field, Gentry, Benjamin & Robertson, P.C., Overland Park, Kan., William G. Beck, Field, Gentry, Benjamin & Robertson, P.C., Kansas City, Mo., for plaintiff.

Roger D. Stanton, Mark D. Hinderks, Stinson, Mag & Fizzell, Overland Park, Kan., Robert L. Driscoll, Christopher F. Pickering, Stinson, Mag & Fizzell, Kansas City, Mo., Marianne Geeker, MCI Telecommunications, Washington, D.C., for defendant.

## MEMORANDUM AND ORDER

EARL E. O'CONNOR, Chief Judge.

This matter is before the court on a number of motions filed by both parties. The plaintiff Catherine M. Smith (Smith) moves for the court to certify a class as to counts 1, 2, and 3 of her complaint, and in a separate motion, moves for class certification as to count 5. The defendant MCI Telecommunications Corporation (MCI) has four motions before the court: a motion for reconsideration of an order wherein we refused to dismiss count 1 of the amended complaint, a motion to dismiss count 3, a motion to dismiss count 5, and a motion to review an order of the magistrate. The facts pertinent to these motions are as follows:

MCI is a long-distance telephone company which employs salespersons to sell its services to the public. MCI compensated its salespersons under a number of different plans. On May 1, 1984, the "Commercial Sales Force Compensation Plan 1985 Fiscal Year Effective May 1, 1984," (May 1, 1984, plan) was instituted. Under this plan, a salesperson received a base salary of either $18,200 or $13,000 (new salespersons were compensated at the higher rate for the first twelve (12) weeks of their employment), plus commissions for sales of long-distance services. The commissions structure of the May 1, 1984, plan was as follows: For sales of residential or commercial "Dial–Up" service,[1] a salesperson received fifteen percent (15%) of the customer's usage cost for the greater of the first partial or full month of usage for qualifying accounts (those with monthly usage equalling or exceeding $15). For sales of residential or commercial "Advantage" service,[2] the salesperson received fifteen percent (15%) of the greater of the first partial or full month of usage for qualifying accounts (those with monthly usage equalling or exceeding $150). For refer-

rals of qualified leads resulting in "Corporate Account Service" sales of Dial–Up or Advantage services, the salesperson received eight percent (8%) of the first full month of usage for qualifying accounts. For qualified leads resulting in a new hardwire customer, the salesperson received $50. The May 1, 1984, plan included a place for the salesperson to sign indicating that the salesperson had read and understood the plan.

The May 1, 1984, plan was altered by an addendum which became effective October 29, 1984 (October 29, 1984, addendum). As a result of the restructuring of the American Telephone and Telegraph Company, Inc., and its Bell operating companies, all MCI customers could, beginning in the fall of 1984, access the MCI long-distance network simply by dialing "1" plus the nine (9) digit telephone number of the party being called. This service was called "Dial 1." Under the terms of the October 29, 1984, addendum, for sales of Dial 1 service, a salesperson received ten percent (10%) of the greater of the first partial or full month of usage. The October 29, 1984, addendum included a place for a salesperson to sign indicating that the salesperson had read and understood the addendum.

Beginning in January 1985, with respect to sales of Dial 1 service, MCI paid a salesperson $10 upon the receipt from the customer of a Letter of Agency (used until March 1985) or a Letter of Confirmation (used after March 1985). Internal memoranda indicate that MCI considered this payment an advance to be charged against the commission earned by the salesperson as a result of the sale. However, no written document indicating this policy was circulated to salespersons until April 1986. The document then-circulated stated that it was effective on January 1, 1985; however, it was signed on April 4, 1986. The doc-

---

**1.** Dial–Up service, which is also referred to as Execunet, was a long-distance service sold to residential and commercial customers. To use this service, the MCI customer would manually dial an access code and authorization number (usually with twenty-two (22) digits), and then dial the nine (9) digit telephone number of the party being called.

**2.** Advantage service allowed MCI customers to bypass dialing the access code and authorization number when calling long distance. A microprocessor which would automatically dial the access code and authorization number was installed on the customer's premises; the customer would simply dial the nine (9) digit telephone number of the party being called.

ument included no place for a salesperson to sign.

The May 1, 1984, plan and the addendum (or addenda) thereto were superseded by the "Commercial Sales Force Compensation Plan 1986 Calendar Year Effective January 1, 1986" (January 1, 1986, plan). Under this plan, a salesperson received a base salary plus commissions. The plan did not change the commission schedule for sales of Dial–Up and Advantage services, or for referral leads resulting in Corporate Account Service or hardwire sales. The plan did modify the commission schedule for sales of Dial 1 service. The salesperson received a $5 advance upon receipt of the Letter of Confirmation; the commission was fifteen percent (15%) of the greater of the first partial or full month of usage for qualifying accounts (those with usage equalling or exceeding $100). The January 1, 1986, plan also included a provision under which the salesperson received a commission for the sale of MCI credit card service; the commission equalled fifteen percent (15%) of the second full month of usage.[3]

On June 1, 1986, the "Commercial Sales Force Compensation Plan 1986 Calendar Year Effective June 1, 1986," (June 1, 1986, plan) became effective. This plan significantly changed the commission schedule for Dial–Up, Advantage, Dial 1, credit card, and Corporate Account services. For sales of Dial–Up service, a salesperson received twenty-five percent (25%) of the first partial month of usage; the salesperson also received an incremental commission of twenty-five percent (25%) of the first full month's usage in excess of the first partial month's usage. The minimum usage requirement was eliminated. For sales of Advantage service, the salesperson's commission was calculated in the same manner as was the commission for sales of Dial–Up service; the minimum usage for a qualifying account was $150. For sales of Dial 1 service, the salesperson's commission was calculated in the same manner as was the commission for sales of Dial–Up and Advantage service; the provision for advance payment and the minimum usage require-

ment were eliminated. For sales of credit card service, the salesperson received twenty-five percent (25%) of the second full month's usage. For referrals of qualified leads resulting in Corporate Account Service sales, the salesperson received thirteen percent (13%) of the first full month of usage (or the first partial month, along with an incremental commission based on the first full month) for qualified accounts (those with usage equalling or exceeding $150). For referrals of qualified leads resulting in hardwire sales, the salesperson still received $50.

MCI stores information regarding customers, sales, and salespersons on various computer systems. The On–Line Computer Information System (OCIS) is the entry point for information regarding customers, such as the customer's name, account number, and services ordered. The New Order Processing System (NOPS) is a batch, rather than on-line, version of OCIS. NOPS interfaces with other computer systems, such as the systems for billing and commissions. The Integrated Commission System (ICS) (this system is also referred to as PI) is the commissions system which reads the NOPS files to acquire commissions information, such as new customers, cancelling customers, and material regarding salespersons. ICS passes this commissions information on to the payroll system. Under ICS, salespersons are identified by social security number.

MCI had problems resulting from ICS. Numerous in-house memoranda indicate that the difficulties included failing to pay advances to salespersons upon the sale of services, generating inaccurate records for salespersons, reporting the first month of usage for Advantage services as zero when in fact the Advantage unit had not yet been installed, failing to properly enter the social security numbers of the salespersons, failing to recognize sales of Dial–Up services, and inaccurately calculating commissions for sales of Dial 1 services.

---

**3.** Smith contends that salespersons were always entitled to commissions on usage of any MCI service, even when the customer accessed MCI by using a credit card, because the May 1, 1984, plan referred to "usage" without explicitly excluding usage based on credit card access.

Smith was employed in MCI's Overland Park, Kansas, office as a salesperson from August 20, 1984, to July 3, 1985. She alleges that MCI systematically cheated its salespersons by failing to pay them proper commissions. To this end, MCI allegedly employed a number of devices, including:

1. Entering accounts into the ICS under a social security number for a person not then-employed by MCI.

2. Entering accounts into the ICS under no social security number.

3. Entering accounts into the ICS under corporate or residential designations, rather than under the commercial designation, thus preventing the proper payment of commissions.

4. Eliminating accounts still generating commissions from the ICS system entirely.

5. Underreporting customer usage on commissions earnings reports provided to salespersons.

6. Leaving the Advantage service automatic dialing units on customer premises after the customers had selected the Dial 1 service, and thereby avoiding payment of commissions for the Dial 1 service on those accounts.

7. Withholding payment of earned commissions until long after the date on which the payments should have been made, thereby avoiding payment altogether to some salespersons who ended employment with MCI.[4]

Smith brought this action against MCI; her amended complaint includes the following counts: (1) a claim under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968, (2) a common law fraud claim based on MCI's acts underlying the RICO claim, (3) a claim for breach of contract based on MCI's failure to pay salespersons' commissions, (4) a common law fraud claim related to MCI's employment contracts (summary judgment in favor of MCI was earlier entered on count 4), and (5) a breach of contract claim based on an allegedly unlawful provision included in the employment contracts.

Currently, the court has before it the following motions: (1) MCI's motion for reconsideration of the court's order dated December 17, 1987, wherein we refused to dismiss count 1 of the amended complaint, (2) Smith's motion for certification of a class as to counts 1, 2, and 3, (3) MCI's motion to dismiss count 3, (4) MCI's motion to dismiss count 5, (5) Smith's motion for certification of a class as to count 5, and (6) MCI's motion to review certain discovery orders entered by the magistrate.

I. *MCI's Motion for Reconsideration.*

MCI moves the court to reconsider its order dated December 17, 1987. *See Smith v. MCI Telecommunications Corp.,* 678 F.Supp. 823 (D.Kan.1987). In that order, we denied a motion by MCI to dismiss count 1 of Smith's complaint, the RICO claim. MCI contends that reconsideration is warranted based on recent changes in Tenth Circuit law.[5]

Initially, we note that we consider a motion for reconsideration under Federal Rule of Civil Procedure 59, which sets forth a ten (10) day time period for filing the motion. MCI's motion, which was filed on September 12, 1988, does not fall within this limitation period. Additionally, the concept of reconsideration implies that the court reexamine its earlier order in light of the law at the date of the order; here, the earlier order was consistent with the law as of the date of its entry.

Thus, we might simply deny MCI's motion; however, we believe that the better approach is to treat the motion as a second motion to dismiss for failure to state a claim on which relief may be grant-

---

4. The payment plans had provisions whereby salespersons forfeited earned commissions if they terminated employment with MCI prior to the payment of the commissions.

5. The alleged recent changes in Tenth Circuit law on which MCI bases its motion involve the pattern requirement of RICO. Thus, our focus here is on this issue. However, we note with interest the Tenth Circuit's recent decision regarding standing and damages under 18 U.S.C. § 1962(a). *See Grider v. Texas Oil and Gas Corp.,* 868 F.2d 1147 (10th Cir.1989) (available on LEXIS: Genfed library, 10cir file; 1989 us app LEXIS 45). MCI has filed a motion to dismiss based on *Grider,* but the motion is not yet ripe.

ed. By so considering the motion, the court may examine whether the current law of the Tenth Circuit precludes recovery by Smith, without considering the merits of our earlier order given the law at its entry date.

MCI contends that the Tenth Circuit's recent decision in *Pitts v. Turner & Boisseau, Chartered*, 850 F.2d 650 (10th Cir. 1988), has changed the legal requirement for a pattern of racketeering activity. To evaluate this contention, we must examine RICO itself and the decisions of the Tenth Circuit, including *Pitts*, interpreting RICO.

To recover under RICO, a pattern of racketeering acts must be established, *see* 18 U.S.C. §§ 1962, 1964(c); a pattern is defined by the statute as at least two acts within ten years. *Id.* § 1961(5). The Supreme Court expounded on the pattern requirement in *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed. 2d 346 (1985):

> The implication is that while two acts are necessary, they may not be sufficient. Indeed, in common parlance two of anything do not generally form a "pattern." The legislative history supports the view that two isolated acts of racketeering activity do not constitute a pattern. As the Senate Report explained: "The target of [RICO] is thus not sporadic activity. The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of *continuity plus relationship* which combines to produce a pattern." S.Rep. No. 91–617, p. 158 (1969) (emphasis added).

*Id.* at 496 n. 14, 105 S.Ct. at 3285 n. 14.

The Tenth Circuit has considered the pattern requirement in four cases. In *Torwest DBC, Inc. v. Dick*, the court held that a pattern requires continuous and related acts. 810 F.2d 925, 928 (10th Cir.1987). "A scheme to achieve a single discrete objective does not in and of itself create a threat of ongoing activity, even when that goal is pursued by multiple illegal acts, because the scheme ends when the purpose is accomplished." *Id.* at 929. Rather than formulate a bright-line test, the *Torwest* court endorsed a case-by-case approach to

determine whether a pattern exists. *Id.* Given the facts that the case involved a single scheme with a single victim and a specific, rather than open-ended, goal, the court found no pattern. *Id. Compare Smith v. MCI Telecommunications Corp.*, 678 F.Supp. 823 (D.Kan.1987) (a pattern exists where a scheme is directed toward one victim but has no single objective).

The Tenth Circuit found that no pattern existed in two of the cases it has decided since *Torwest*, both times finding that the alleged scheme had a single, discrete objective. In *Garbade v. Great Divide Mining & Milling Corp.*, 831 F.2d 212 (10th Cir. 1987), the court held that a scheme whereby the principal officer and primary shareholder of a company secretly withdrew company funds to repay a loan he had made to the company did not constitute a pattern, as the withdrawals ceased when the definite, single objective of the scheme, repayment of the loan, was accomplished. *Id.* at 213–14. In *Condict v. Condict*, 826 F.2d 923 (10th Cir.1987), the court found no pattern in a scheme whereby one part of a family attempted to achieve the definite, single objective of depriving another part of the family of their rightful share of the family ranch. *Id.* at 928–29.

Against this backdrop of cases, the Tenth Circuit considered *Pitts*, the case on which MCI relies in this motion. In *Pitts*, a dentist was represented by a law firm in hearings before the state dental board; following the hearings, his license to practice dentistry was revoked. *Pitts*, 850 F.2d at 651. The dentist filed a civil rights action against the dental board; in this proceeding, the law firm aided in the representation of the dental board. *Id.* The dentist then sued the dental board and the law firm, among others, claiming that the defendants knew of the fiduciary relationship between the dentist and the law firm, and that the defendants conspired to get the firm to divulge confidential information obtained during the hearings before the dental board. *Id.* at 652–53. The dentist brought a claim under RICO, which Judge Saffels of this district dismissed. *Id.* at 653. The dentist appealed.

The Tenth Circuit's decision quoted *Torwest* extensively, including the statement that a pattern is not evinced by a single scheme with a single, discrete objective where ongoing activity is not threatened. *See id.* The *Pitts* court also quoted the district court's opinion, stating that the "defendants schemed to defraud plaintiff of his confidences and secrets by representing that such confidences and secrets would not be revealed to others or be used against him." *Id.* (quoting the district court). The Tenth Circuit concluded that dismissal was proper:

> After examining appellant's amended complaint and making all reasonable inferences in favor of appellant we agree that there is only one scheme alleged and this alone does not establish a RICO "pattern" which is required to support a RICO claim.

*Id.* This was the only pattern analysis in *Pitts* which was not a direct quote from another decision.

MCI contends that in *Pitts*, the Tenth Circuit held that a single scheme can never satisfy the RICO pattern requirement, and consequently, Smith's complaint, which alleges only one scheme, fails to state a claim. We disagree for the following reasons. First, at issue in *Pitts* was a single scheme which had no threat of ongoing activity. Basically, the dentist asserted that during his civil rights suit, the dental board and the law firm defrauded him by conspiring to share confidential information. Although this scheme may have involved numerous acts, it necessarily ended after the information was revealed or when the litigation itself ended. Therefore, in contrast to the facts presented in the instant action, *see Smith,* 678 F.Supp. at 825, 827, no threat of ongoing activity existed.

Second, we interpret the *Pitts* holding to be directed at the specific facts of that case. *See Torwest,* 810 F.2d at 929 (where the Tenth Circuit specifically declined to formulate a bright-line test and instead endorsed a case-by-case approach to determine whether a pattern exists). Unhappily, the court used rather broad language, stating that "there is only one scheme alleged and this alone does not establish a RICO 'pattern.' " *Pitts,* 850 F.2d at 652. Never-

theless, the sentence may be interpreted as meaning that the particular scheme involved in *Pitts* does not establish a pattern, and this is the interpretation we adopt.

Third, to the extent that the *Pitts* language may be more broadly interpreted, the language is dicta. As stated above, the court did not have before it a single scheme involving the threat of ongoing activity. Thus, any holding which extends to such a scheme is overly broad given the *Pitts* facts.

Fourth, we remain persuaded by the approach and analysis of the Seventh Circuit as stated in *Morgan v. Bank of Waukegan,* 804 F.2d 970 (7th Cir.1986). The *Morgan* court declined to accept a rigid rule whereby no single scheme, even if ongoing, could constitute a pattern. *Id.* at 975–76. Until the Tenth Circuit specifically rejects the Seventh Circuit's approach, it remains the law in our view.

Fifth, a review of the cases in this district reveals a distinct trend toward recognizing a single, ongoing scheme as a pattern. *See Wichita Federal Savings & Loan Association v. Landmark Group, Inc.,* 674 F.Supp. 321, 331 (D.Kan.1987) (where Judge Kelly abandoned his earlier pattern position espoused in *Agristor Leasing v. Meuli,* 634 F.Supp. 1208 (D.Kan. 1986), which required multiple schemes); *O'Connor v. Midwest Pipe Fabricators, Inc.,* 660 F.Supp. 696, 698 (D.Kan.1987) (where, in light of *Torwest,* Judge Saffels rejected his earlier decisions which required multiple schemes). *But see Boyer v. Cline,* No. 85–1562 (D.Kan., *unpublished,* July 22, 1987) (where Judge Crow held that a single scheme with a single victim does not indicate a pattern, even though the scheme is open-ended).

 Given these reasons, we are unwilling to hold that *Pitts* requires that we abandon the position we adopted in *Smith.* In our opinion the law is that a pattern may be evinced by a single scheme which is open-ended. Thus, MCI's motion to dismiss count 1 for failure to state a claim is denied.

## II. *Smith's Motion for Certification of a Class for Counts 1, 2, and 3.*

Smith moves for certification of the following class on counts 1, 2, and 3 of her first amended complaint:

> All persons employed by MCI Telecommunications Corporation in its Overland Park, Kansas office (within its Mid America Region and, later, also within its Southwest Division) to sell commercial long-distance communication services and products from the adoption of MCI Telecommunications Corporation's "Commercial Sales Force Compensation Plan" from May 1, 1984 through December 31, 1986, excluding persons employed *solely* to sell corporate account services and products.

Federal Rule of Civil Procedure 23(a) lists the following prerequisites to a class action:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all parties is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

These requirements are often referred to as numerosity, commonality, typicality, and adequacy of representation. *See, e.g., Aguinaga v. John Morrell & Co.,* 602 F.Supp. 1270, 1278 (D.Kan.1985). Additionally, for a case to proceed as a class action, it must fit into one of the categories described in Rule 23(b). *Id.* Smith contends that the instant action meets the standards set forth in Rule 23(b)(3), which states that

the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

The two basic requirements of Rule 23(b)(3) may be referred to as predominance and superiority.

Smith has the burden of demonstrating satisfaction of the Rule 23 requirements.[6] *Rex v. Owens ex rel. State of Oklahoma,* 585 F.2d 432, 435 (10th Cir. 1978) (citing cases). However, the Tenth Circuit has stated that "if there is error to be made, let it be in favor and not against the maintenance of the class action." *Esplin v. Hirschi,* 402 F.2d 94, 99 (10th Cir. 1968), *cert. denied,* 394 U.S. 928, 89 S.Ct. 1194, 22 L.Ed.2d 459 (1969). In determining whether a class should be certified, the court must not delve into the merits of the action, *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177–78, 94 S.Ct. 2140, 2152–53, 40 L.Ed.2d 732 (1974); nonetheless, the court often must, to some extent, analyze the elements of the claims and defenses of the parties. *Joseph v. General Motors Corp.,* 109 F.R.D. 635, 637–38 (D.Colo.1986).

---

**6.** As noted by MCI, some courts have taken a relatively restrictive view of the certification requirements because of the potential for adding undesirable clout to nuisance suits. Some rather colorful examples of courts' reasoning on this issue follow:

> The class action serves a worthy and valuable purpose; yet the class action can also become a weapon of unfairness and harassment, such as would bludgeon even innocent businessmen into surrender to the force of mass litiga-

tion by even a single person who claims mass action rights and representation.

*Kekich v. Travelers Indemnity Co.,* 64 F.R.D. 660, 660 (W.D.Pa.1974).

> The court should not breath life into the Frankenstein monster of Rule 23, Federal Rules of Civil Procedure, unless the plaintiff first carries his burden and justifies application of the rule.

*San Antonio Telephone Co. v. American Telephone and Telegraph Co.,* 68 F.R.D. 435, 436 (W.D.Tex.1975).

### A. *Numerosity.*

Under Rule 23(a)(1), the proposed class must be so large that joinder of all members is impracticable. The numerosity determination depends on the particular facts of the case. *Rex*, 585 F.2d at 436; *Aguinaga*, 602 F.Supp. at 1278 (citing *Horn v. Associated Wholesale Grocers, Inc.*, 555 F.2d 270 (10th Cir.1977)). According to a personnel chart provided by MCI, the proposed class includes ninety-six (96) members. Given this, we find that the numerosity requirement is met. Further, we find that the class is precisely defined, as is necessary in an action wherein damages are sought. *See McHan v. Grandbouche*, 99 F.R.D. 260, 265 (D.Kan.1983).

### B. *Commonality.*

Rule 23(a)(2) requires that there be questions of law or fact common to the class. *See Fertig v. Blue Cross of Iowa*, 68 F.R.D. 53, 57 (N.D.Iowa 1974) ("[a]s a general rule all that this section requires is *either* common questions of fact *or* common questions of law"). In the instant action, common questions of both exist.[7] MCI employed all of the members of the proposed class as salespersons in the Overland Park, Kansas, office. All of the members of the proposed class were allegedly subjected to unlawful treatment by MCI (namely, MCI's alleged systematic refusal to properly pay commissions), giving rise to RICO, fraud, and contract claims. Thus, the Rule 23(a)(2) requisite is met.

### C. *Typicality.*

Under Rule 23(a)(3), the claims or defenses pertaining to Smith must be typical of the claims or defenses of the proposed class. The typicality standard does not require that Smith, as the named plaintiff, "be in a position identical to that of every member of the putative class."

*Aguinaga*, 602 F.Supp. at 1279 (citing *Rich v. Martin Marietta Corp.*, 522 F.2d 333, 340 (10th Cir.1975)); *see also Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir.1984), *cert. denied*, 470 U.S. 1004, 105 S.Ct. 1357, 84 L.Ed.2d 379 (1985). Rather, if the alleged harm suffered by Smith is of the same type as the harm suffered by members of the proposed class, the typicality requirement is met even if the degree of Smith's harm may differ from that of the members of the proposed class. *McQuilken v. A & R Development Corp.*, 576 F.Supp. 1023, 1029 (E.D.Pa.1983).

MCI asserts that typicality does not exist because Smith was employed and compensated under the May 1, 1984, plan and the October 29, 1984, addendum thereto, whereas other members of the proposed class were compensated under different plans. We address this contention in subsection E below. MCI further contends that Smith is not typical of the proposed class members because she is subject to a jurisdictional challenge not applicable to the proposed class.

As discussed below in section III, Smith initially pursued, and later abandoned, a claim regarding her employment and compensation by MCI with the Kansas Department of Human Resources (KDHR). The KDHR has the power to provide full relief for unpaid wages and penalties; however, punitive and treble damages cannot be awarded by the KDHR. Given this, the KDHR could have afforded Smith full relief with respect to her contract claim (count 3), but not with respect to her RICO claim (count 1) and her fraud claim (count 2). Therefore, MCI asserts that (1) it has a valid challenge to the court's subject matter jurisdiction over Smith's contract claim, (2) this challenge could not be raised

---

7. In fact, MCI does not dispute that common questions of law and fact exist. Rather, MCI argues that despite the existence of common questions, individual issues predominate. Indeed, it may be argued that the commonality requirement is at least partially redundant given the requirements of Rule 23(b), each subsection of which requires the existence of common issues. *See* C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 1763 at 227 (2d ed. 1986); *see also McQuilken v. A & R Development Corp.*, 576 F.Supp. 1023, 1029 (E.D. Pa.1983). For example, Rule 23(b)(3), the subsection under which certification is sought in the instant action, requires that common issues predominate over any individual issues. Thus, under Rule 23(b)(3), the court necessarily must determine not only that common questions exist, but that they are paramount. We discuss predominance in subsection E below.

against the other members of the proposed class, and (3) the typicality requirement is therefore unsatisfied with respect to the contract claim. However, in section III below, we reject MCI's assertion that Smith cannot proceed on her contract claims in this court because of her failure to exhaust. Thus, typicality is satisfied as to counts 1, 2, and 3.

### D. *Adequacy of Representation.*

■ Rule 23(a)(4) requires that Smith be a suitable party who will fairly and adequately protect the interests of the proposed class. The adequacy standard requires that (1) the named plaintiff not have interests which are antagonistic to those of the class, and (2) the named plaintiff's attorney be qualified to conduct the litigation as a class action. *Aguinaga,* 602 F.Supp. at 1279; *McQuilken,* 576 F.Supp. at 1029. MCI does not challenge the qualifications of Smith's attorneys, and the court finds that they are capable of conducting this litigation as a class action. MCI does, however, assert that Smith's personal animosity toward MCI renders her inadequate as a class representative.

■ Following her termination from MCI, Smith initiated the following actions against MCI: Initially, Smith pursued administrative remedies with the Kansas Commission on Civil Rights and the Equal Employment Opportunity Commission. She then brought an action alleging Title VII violations. Judgment on the Title VII action was entered in Smith's favor following her acceptance of MCI's offer of judgment for $30,000 plus costs and attorney's fees (fees in excess of $50,000 were eventually awarded). Smith also filed an administrative claim seeking unpaid commissions with KDHR; as indicated above and discussed in detail below, Smith abandoned this claim. She then filed a complaint in Kansas state court alleging that MCI's commission plan was unlawful; she voluntarily dismissed this complaint. Finally, she filed the instant action regarding the commission plan.

Given this background, we do not find that Smith is, as MCI asserts, a plaintiff preoccupied "with peculiar retaliatory wrongs" allegedly done to her. *See Sheehan v. Purolator, Inc.,* 103 F.R.D. 641, 652 (S.D.N.Y.1984). Instead, she is an individual who has merely sought redress for two aspects of her former employment: her termination and her compensation. Simply stated, the record does not indicate that Smith would inadequately represent the proposed class as a result of a personal vendetta against MCI. Thus, the Rule 23(a)(4) requirements are met.

### E. *Predominance.*

Having successfully established the requisites of Rule 23(a) with respect to her RICO and fraud claims, Smith must establish the two basic requirements of Rule 23(b)(3): predominance and superiority. An analysis of whether common questions predominate over individual questions begins with a discussion of the elements of the RICO and fraud causes of action.

Smith makes civil RICO allegations based on 18 U.S.C. § 1962(a), which proscribes the use of funds derived from a pattern of racketeering activity to acquire, establish, or operate an enterprise engaging in or affecting interstate commerce. Racketeering activity is defined to include any act indictable under 18 U.S.C. § 1341 (mail fraud) or 18 U.S.C. § 1343 (wire fraud). These sections, which have parallel language, make it unlawful for a person to devise or intend to devise "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises," if the person uses or attempts to use the mails or wired communications in furtherance of the scheme. *See* 18 U.S.C. §§ 1341, 1343. Under 18 U.S.C. § 1964, a person injured by a violation of section 1962 may bring a cause of action in district court. Thus, in the instant action, the elements of a section 1962(a) civil RICO claim include (1) a pattern, (2) of mail or wire fraud (which includes (a) a misrepresentation, and (b) the use of the mails or wired communications), and (3) an injury.[8]

---

**8.** As to the injury required under section 1962(a), the court earlier ruled that Smith need not demonstrate an injury resulting from MCI's

use of the alleged racketeering proceeds; rather, she could recover simply by proving an injury resulting from the alleged predicate acts from

Kansas courts have, to some extent, vacillated on the elements of common law fraud. *See Smith,* 678 F.Supp. at 830 (noting the varying pronouncements of Kansas courts). However, under the weight of authority, fraud includes (1) an untrue statement of fact, (2) known by the defendant to be untrue and made by the defendant with the intent to deceive or with reckless disregard for the truth, (3) reliance on the statement by the plaintiff, and (4) resulting injury to the plaintiff. *See, e.g., Tetuan v. A.H. Robins Co.,* 241 Kan. 441, 467, 738 P.2d 1210, 1230 (1987); *Slaymaker v. Westgate State Bank,* 241 Kan. 525, 531, 739 P.2d 444, 450 (1987); *Weigand v. Union National Bank of Wichita,* 227 Kan. 747, 753, 610 P.2d 572, 577 (1980); *Nordstrum v. Miller,* 227 Kan. 59, 65, 605 P.2d 545, 551–52 (1980). The reliance element appears to have both a subjective and an objective prong: the plaintiff must actually rely on the misrepresentation and thereby incur damages, *Tetuan,* 241 Kan. at 468, 738 P.2d at 1230, and the plaintiff's reliance must be reasonable. *Hutchinson Travel Agency, Inc. v. McGregor,* 10 Kan. App.2d 461, 464, 701 P.2d 977, 980 (1985) (reliance must be reasonable, justifiable, and detrimental); *see also Tetuan,* 241 Kan. at 468, 738 P.2d at 1231 (reliance must be justifiable).

MCI asserts that individual issues predominate over the common issues in the instant action. The individual issues that MCI asserts are predominant are the injury element present in both the RICO and the fraud claims, and the misrepresentation and reliance elements of the fraud claim.

■ Initially, we focus on the issue of damages. In essence, Smith's complaint alleges that because of MCI's actions, salespersons were cheated out of the commissions to which they were entitled. Thus, the members of the proposed class all suffered the same type of damages. *See McQuilken,* 576 F.Supp. at 1029. Further, the fact that the proposed class members worked under different compensation plans does not indicate that the damages

question is predominately individualized. Of course, the amount of damages allegedly suffered by members of the prospective class will vary depending on the plans under which they worked and the number of sales on which they were denied commissions. However, the actual amount of damages "is invariably an individual question and does not defeat class action treatment." *Blackie v. Barrack,* 524 F.2d 891, 905 (9th Cir.1975), *cert. denied,* 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976); *see also McQuilken,* 576 F.Supp. at 1029. Thus, if the computation of damages following a ruling in favor of the class is a largely mechanical task, then "the existence of individualized claims for damages seems to offer no barrier to class certification...." *Windham v. American Brands, Inc.,* 565 F.2d 59, 68 (4th Cir.1977), *cert. denied,* 435 U.S. 968, 98 S.Ct. 1605, 56 L.Ed.2d 58 (1978); *see also Blackie,* 524 F.2d at 905. However, if the computation of damages will require separate "mini-trials," then the individualized damages determination predominates over common issues, and a class should not be certified. *Windham,* 565 F.2d at 68.

In the instant action, should MCI be found liable, damages would depend on the evidence regarding sales for which individual employees were not paid commissions. MCI argues that determining damages will involve "the painstaking process of comparing accounts sold and commissions paid during the time each of the different commission plans and addenda was in effect." Smith responds that "[t]o calculate the unpaid commissions, [it is necessary] to either (1) run the unpaid sales against billing data using ICS with a special test program, or (2) use a pocket calculator on the actual customer bills to determine the amount owed in commissions." Essentially, Smith suggests that should she and the proposed class prevail, the court could simply compel an accounting from MCI. We agree. At trial, Smith, as the class representative, would merely need to demonstrate that

---

which the funds were derived. *Smith,* 678 F.Supp. 828–29. The instant order proceeds under this interpretation of the law. However, as stated above, the court notes with interest the

recent case of *Grider v. Texas Oil and Gas Corp.,* 868 F.2d 1147 (10th Cir.1989).

MCI had in fact defrauded class members by systematically entering misinformation into its computer systems. Of course, some evidence of specific acts by MCI would be required. However, each sale resulting in a miscalculated commission would not have to be examined. Rather, Smith could present adequate evidence indicating MCI's alleged pattern of action, the fact-finder could make its determination regarding MCI's liability, and the parties could then present the court with summaries of their positions on the issue of what MCI paid and what MCI actually owed. In sum, the damages allegedly suffered by the proposed class members were all of the same type, and the calculation of damages following a ruling in favor of the class would be a largely mechanical task. Thus, the calculation of damages is not an individualized process *which predominates* over the common issues presented in the instant action.

■ Next, we focus on the misrepresentation and reliance elements of the fraud claim. MCI asserts that as to the element of misrepresentation, individual issues predominate over common issues.[9] Specifically, MCI contends that the evidence at trial is likely to include numerous alleged oral misrepresentations made by MCI management to the salespersons indicating that the salespersons would be paid the commissions due them under the plans.[10] *See, e.g., Seiler v. E.F. Hutton & Co.*, 102 F.R.D. 880, 888 (D.N.J.1984) ("[i]t is the general rule that an action based substantially on oral rather than written communications is inappropriate for treatment as a class action"); *McHan*, 99 F.R.D. at 266 ("the fact that we are dealing primarily with oral representations made at different times by the defendants raises issues which are personal to each separate plaintiff and are, therefore, uncommon to the class as a whole"); *Miller v. Central Chinchilla Group, Inc.*, 66 F.R.D. 411, 415 (S.D.Iowa

1975) ("where the challenged misinformation was disseminated orally rather than in writing, class action treatment has been held inappropriate on the grounds that, since oral misrepresentations are substantially more susceptible of material variation than written misrepresentations, there is no predominance of common issues with respect to such oral misrepresentations, even when there is some degree of similarity among the misrepresentations made"). Smith responds that in determining whether to certify a class, the court's focus should be on her complaint, not her deposition testimony, and that her first amended complaint demonstrates that her fraud claim is based on uniform, written misrepresentations made to all proposed class members.

We agree with Smith that the alleged oral misrepresentations are not individualized issues which predominate over the common issues presented. Smith's complaint indicates that the basic misrepresentation made to the salespersons was that they would be paid commissions according to the terms of the plans and addenda then in effect. The plans and addenda were written documents (with the exception of the January 1, 1985, addendum) which were shown to all salespersons. Thus, the basic misrepresentation giving rise to the fraud claim is uniform (although different plans were in effect at different times, all salespersons were subject to the same alleged misrepresentation: that they would be compensated under the terms of the plan then in effect) and written. *Compare, e.g., McHan*, 99 F.R.D. at 266 (where the court denied class certification in part because of the fact that it was "dealing primarily with oral representations"). The issue of misrepresentation therefore presents a common, rather than an individualized, question. *See Clark v. Cameron–Brown Co.*, 72 F.R.D. 48, 59 (M.D.N.C.1976) ("where

---

9. Actually, MCI makes its argument regarding the differing oral representations allegedly made by management in that portion of its memorandum which addresses certification of a class on the contract claim in count 3. However, the argument is also relevant as to the fraud claim, and we address it in our discussion of fraud.

10. MCI bases this contention on the fact that in her deposition, Smith, when asked to disclose untrue statements made by MCI representatives, mentioned numerous alleged oral misstatements.

the fraud complained of constitutes a common course of action composed of many separate activities, so that it is the design of the defendant to influence all investors generally, or where fraud is carried out through recurring misrepresentations and nondisclosures in a series of prospectuses, annual reports, proxies, and press releases as alleged in this action, so that all plaintiffs are affected by similar representations, the maintenance of a single class of purchasers affected by the defendant's activities is proper" (multiple citations omitted)). Further, the fact that evidence of oral misrepresentations may be presented does not, in the court's mind, cause individualized questions to predominate. Oral misrepresentations may indicate MCI's awareness of or indifference to the commissions problems; however, the common issue of misrepresentation through the plans themselves predominates over the individualized issue of oral misstatements made to salespersons.

■■■ As to reliance, MCI asserts that the inquiry is clearly individualized and precludes certification. *See, e.g., McHan,* 99 F.R.D. at 266 ("[t]he primary personal issue present in a case of common law fraud which precludes the use of the class action device is the necessity of proof of reliance by each member of the purported class"); *Wilensky v. Olympic Airways, S.A.,* 73 F.R.D. 473, 479 (E.D.Pa.1977) (the reliance element of common law fraud presents an individualized question). Smith responds that the salespersons' reliance on the plans is demonstrated simply by their employment with MCI. We agree. It is implausible that, in initiating or continuing their employment with MCI, the salespersons did not rely on the commissions plans which they were required to sign. Further, whether their reliance was reasonable is an objective inquiry common to the entire proposed class. *See, e.g., Fisher v. Plessey Co.,* 103 F.R.D. 150, 155 (S.D.N.Y.1984) (in a securities fraud action, the issue of the materiality of the misrepresentation involves an objective inquiry; therefore, the

materiality issue is general rather than individual). Thus, reliance in the instant action presents common, rather than individual, questions.

In summary, the court is of the opinion that the common issues presented under the instant facts predominate over the individual issues presented. Accordingly, we must examine the second requirement of Rule 23(b)(3), superiority.

## F. *Superiority.*

■■ Rule 23(b)(3) sets forth four factors which should be considered by the court in determining whether a class action is superior to other methods of adjudicating the controversy herein at issue. The first factor to be weighed is the interest of the members of the proposed class in individually controlling the prosecution of separate actions. Fed.R.Civ.P. 23(b)(3)(A). Here, the members of the proposed class have little interest in individually pursuing the RICO or fraud claims, as evinced by the fact that none of the proposed members has filed a lawsuit on those claims.[11] The second factor to be considered is the extent and nature of any litigation concerning the controversy already commenced by proposed class members. *Id.* 23(b)(3)(B). Here, there is no such litigation. The third factor is the desirability of concentrating the litigation in this forum. We find that concentration of the litigation in this forum is desirable. Relitigation of the common issues of this action, which we earlier found to be predominate, in nearly one hundred "individual actions or arbitration proceedings would be grossly inefficient and wasteful of judicial resources." *Joseph v. General Motors Corp.,* 109 F.R.D. 635, 642 (D.Colo.1986). Further, all of the proposed class members reside in this judicial district; thus, the common law of Kansas, with which this court is familiar, applies and no choice of law questions arise. *Compare Gatzke v. Owen,* 69 F.R.D. 412, 417 (N.D.Miss.1975) (stating that where the proposed class members reside in as many

---

**11.** The court notes that a few of the members of the proposed class have initiated actions with the KDHR. However, as indicated above, the KDHR is not the proper forum for assertion of the RICO and fraud claims. Further, the contract claim, which could be pursued before the KDHR, will not receive class certification, as discussed above in subsection C.

as twenty (20) jurisdictions, choice of law questions may preclude class certification). Additionally, the expense of modern-day litigation is likely to discourage the initiation of individual lawsuits in this controversy, as each proposed class member's alleged damages are relatively insubstantial. *See Katz v. Comdisco, Inc.,* 117 F.R. D. 403, 413 (N.D.Ill.1987); *Joseph,* 109 F.R. D. at 642. The fourth factor to be considered is the difficulty of judicial management of a class action. Fed.R.Civ.P. 23(b)(3)(D). In the instant action, in which we have determined that common issues predominate, class certification will not present problems related to manageability. Further, to the extent that individual issues, such as the amount of each class member's damages, exist, the court may address these issues following trial or in separate proceedings. *See Clark,* 72 F.R.D. at 60 (damages may be determined after trial); *Joseph,* 109 F.R.D. at 642 (individual questions presented may be resolved in separate proceedings).

In summary, the court, having found the requisites of Rule 23 satisfied, will certify the proposed class on counts 1, 2, and 3 of Smith's first amended complaint. In reaching this result, the court is mindful of the Tenth Circuit's mandate that "if there is error to be made, let it be in favor and not against the maintenance of the class action." *Esplin,* 402 F.2d at 99. Further, we note that if it is later apparent that a class action is not the most efficient form of litigating the controversy, we may decertify the class.

### III. *The Parties' Motions Pertaining to the Contract Claims in Counts 3 and 5.*

In count 3 of her complaint, Smith seeks recovery on a contract claim, alleging that MCI failed to pay her commissions pursuant to the commissions plans. In count 5, Smith asserts that MCI "breached its contractual obligation to pay each class member the amount of commissions due and owing to them by applying the unlawful provisions of the Plan." The plan includes the following provision:

A Participant under this Plan whose employment is terminated with MCI, for any reason whatsoever, will earn sales and referral commissions for qualifying accounts whose billing period ended on or before the effective date of the termination. No commissions will be earned for billing periods that end after the date of termination.

Kansas law provides as follows:

Whenever an employer discharges an employee or whenever an employee quits or resigns, the employer shall pay the employee's earned wages not later than the next regular payday upon which he or she would have been paid if still employed as provided under K.S.A. 44–314 either through the regular pay channels or by mail postmarked within the deadlines herein specified if requested by the employee.

K.S.A. 44–315(a). MCI contends that Smith's count 5 claim is better characterized as an action for failure to comply with the Kansas wage and hour laws, rather than as a breach of contract action. However, under the Kansas Supreme Court's ruling in *Temmen v. Kent–Brown Chevrolet Co.,* 227 Kan. 45, 50, 605 P.2d 95, 99–100 (1980), the count 5 claim apparently may be construed as a breach of contract action. In any event, the label given the claim does not affect our discussion below.

### A. *MCI's Motions to Dismiss.*

MCI seeks dismissal of counts 3 and 5, whereas Smith seeks certification of a class for the claims.[12] MCI advances a number of reasons for dismissal. First, MCI contends that dismissal is mandated because of Smith's failure to exhaust the administrative remedies available to her.[13] Second, MCI asserts that the court should use its discretion to require exhaustion of administrative remedies. Third, MCI contends that the court should decline to exercise pendant jurisdiction over count 5, which is grounded in state law. Fourth, MCI asserts that the court should stay any action as to counts 3 and 5 until Smith has ex-

---

**12.** We discussed class certification with respect to count 3 above.

**13.** MCI asserts this argument only with respect to its motion to dismiss count 5.

hausted the available administrative remedies. Smith responds that exhaustion is not required, administrative remedies are inadequate, and the court should exercise its pendant jurisdiction. Central to all of these arguments are (1) the role which the KDHR should play in resolving the dispute between Smith and MCI, and (2) the role which this court should play in resolving this matter in a relatively efficient and economical manner.

Initially, we note that Smith suggests that the court consider MCI's motions to dismiss as motions for summary judgment because matters outside the pleadings are presented. *See* Fed.R.Civ.P. 12(b). However, MCI's motions to dismiss for failure to exhaust administrative remedies address the court's subject matter jurisdiction.[14] *See* C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 1350 (1987 Supp.) (citing cases at n. 52.1); *Wynn v. Boeing Military Airplane Co.,* 595 F.Supp. 727, 728 (D.Kan.1984) (the plaintiff's alleged failure to exhaust remedies provided in a collective bargaining agreement is a challenge to the court's subject matter jurisdiction). As a general rule, a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction cannot be converted into a Rule 56 motion for summary judgment. *Wheeler v. Main Hurdman,* 825 F.2d 257, 259 (10th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 503, 98 L.Ed.2d 501 (1987). "Unlike the strict limitations under 12(b)(6) against considering matters outside the complaint, a 12(b)(1) motion is considered a 'speaking motion' and can include references to evidence extraneous to the complaint without converting it to a Rule 56 motion." *Id.* at 259 n. 5. Further, in the instant action, the jurisdictional challenge, failure to exhaust, is not intertwined with the merits of the case. *See id.* at 259. Thus, despite our reliance on matters outside the pleadings, we treat MCI's motions as motions to dismiss under Rule 12(b)(1).

Kansas law provides that the secretary of the KDHR is authorized to enforce the provisions of the Kansas wage and hours laws. An administrative claim made before the secretary proceeds as follows: The secretary must investigate the claim to determine whether a dispute exists; if so, the secretary shall conduct a hearing. K.S.A. 44–322a(a). In making his determination regarding the claim, the secretary has the power to issue compulsory process to compel the attendance of witnesses or the production of evidence, examine witnesses under oath, and apply to state district court judges for citations of contempt in connection with failures to comply with process. *See id.* 44–322(c), 44–322(d), 44–322a(c). Following the hearing, the secretary must determine whether the claim is valid, and if so, the amount of damages. *Id.* 44–322a(d). The secretary's decision may be appealed to the state district court, where it is subject to review in accordance with the standards for review of administrative actions. *Id.* 44–322a(c), 44–322a(d).

As an alternative to filing a claim before the KDHR, an employee may bring a claim for unpaid wages in any court of competent jurisdiction. *Id.* 44–324(a).

In the instant action, Smith filed a claim with the KDHR on August 12, 1985, asserting that MCI failed to pay the commissions that she earned during her employment. The KDHR notified MCI, requesting a response. On September 26, 1985, MCI responded. Smith supplied the KDHR with a list of telephone numbers on which she was allegedly denied commissions. The KDHR requested that MCI supply the first full month's billing for the numbers, and asked for proof of payment to Smith. MCI responded by asking that Smith complete forms regarding the telephone numbers to enable MCI to efficiently conduct its research. The KDHR again requested the billing information from MCI, implying that Smith need not furnish any further information. On February 28, 1986, the KDHR issued a subpoena duces tecum directing MCI to provide the billing information. On March 14, 1986, the KDHR set a

---

**14.** Kansas courts have stated that "[a]lthough exhaustion of administrative remedies may appear on its face to involve subject matter jurisdiction, it does not." *Cussimanio v. Kansas City Southern Railway Co.,* 5 Kan.App.2d 379, 385, 617 P.2d 107 (1980). However, this court does not look to Kansas law to define the parameters of its jurisdiction.

hearing date of April 10 and 11, 1986. On April 8, 1986, MCI provided the billing information, indicating that a separate explanation of the documents was forthcoming. On the same date, the KDHR continued the hearing. On April 11, 1986, MCI provided the KDHR with the explanation of the billing documents. On April 15, 1986, the KDHR asked Smith's attorney to inform it of any further records which Smith required to set forth her claim. On April 22, 1986, MCI provided the KDHR with further documentation of Smith's accounts. On May 9, 1986, the KDHR again asked Smith's attorney to indicate what further information was needed from MCI. On July 21, 1986, the KDHR sent Smith's attorney a letter indicating that because no action had been taken following the May 9, 1986, letter, the agency assumed that Smith had decided not to continue to pursue her claim. On August 20, 1986, the KDHR notified Smith's attorney that it was discontinuing further action on Smith's claim. On August 21, 1986, Smith's attorney sent the KDHR a letter indicating that, as was apparently discussed in a telephone conversation of the same date, Smith was compiling documentation for her claim. On August 26, 1986, the KDHR replied, stating that the claim remained open. On September 29, 1986, the KDHR wrote Smith's attorney, stating that Smith needed to provide information validating her allegations that MCI had failed to properly pay commissions and that MCI's documentation to the KDHR was inaccurate. On October 22, 1986, the KDHR wrote Smith's attorney, again requesting evidence which would indicate that Smith was in fact entitled to the commissions which she sought. The letter stated as follows:

> I assure you and your [client] that we have no hesitancy to issue subpoenas or to seek court enforcement at such time as we are convinced that such action is necessary and appropriate. I must add however that we cannot continue with our investigation until the above requested information is supplied to us.... You may choose to pursue the claims in district court thus removing them from our jurisdiction. However I again assure

you that we stand ready to assist your clients in the investigation.

On January 16, 1987, Smith's attorney sent the KDHR a letter stating that Smith was discussing the controversy directly with MCI, and requesting that the claim remain open. On April 27, 1987, the KDHR sent a letter to Smith's attorney requesting to be notified of the status of the claim. On May 11, 1987, Smith's attorney mailed to the KDHR a letter indicating that Smith had chosen to pursue her claim through litigation, and requesting that the claim before the KDHR be withdrawn without prejudice. On May 15, 1987, the KDHR complied with the request.

■■■ MCI asserts that under Kansas law, exhaustion of available administrative remedies is mandated prior to proceeding in court. We disagree. K.S.A. 44–324 provides that "[a]ny proceeding by one or more employees to assert any claim arising under or pursuant to this act may be brought in any court of competent jurisdiction." Thus, unlike the acts construed in the cases cited by MCI, *see* K.S.A. 44–1010 & 1011; *id.* 72–5430a, the wage and hours laws specifically allow a party to initiate an action in court rather than before the KDHR. Moreover, Kansas courts have not construed K.S.A. 44–324 to require that a plaintiff exhaust administrative remedies before filing a wage and hours claim in court. Thus, we decline to hold that Kansas law mandates exhaustion.

Nonetheless, MCI contends that even if exhaustion is not mandated, the court should, in its discretion, dismiss counts 3 and 5 because of Smith's failure to exhaust administrative remedies. MCI asserts that dismissal is especially warranted because Smith initially chose to pursue administrative remedies and later abandoned the administrative process to proceed in this court.

In considering whether to dismiss for failure to exhaust administrative remedies, two competing interests are at stake. On one hand, we must take heed of the legislature's determination that a claimant may proceed in court. *See* K.S.A. 44–324(a). On the other hand, we must be mindful

that the legislature also provided for administrative avenues of relief, *see id.* 44–322a, and we must consider the principles underlying the exhaustion doctrine.

■ The exhaustion doctrine is designed to properly balance the relationship between courts and administrative agencies. *Jenkins v. Newman Memorial County Hospital,* 212 Kan. 92, 95, 510 P.2d 132, 134–35 (1973), *overruled by, Stephens v. Unified School District,* 218 Kan. 220, 546 P.2d 197 (1975). The Kansas Supreme Court has explained the doctrine as follows:

> A primary purpose of the doctrine is the avoidance of premature interruption of the administrative process. It is normally desirable to let the administrative agency develop the necessary factual background upon which its decisions are based. Since agency decisions are frequently of a discretionary nature, or frequently require expertise, the agency should be given the first chance to exercise that discretion or to apply that expertise. It is more efficient for the administrative process to go forward without interruption than it is to permit the parties to seek aid from the courts at various intermediate stages. The very same reasons lie behind judicial rules sharply limiting interlocutory appeals. Frequent and deliberate flouting of administrative processes could weaken the effectiveness of an agency by encouraging people to ignore its procedures.

*Jarvis v. Kansas Commission on Civil Rights,* 215 Kan. 902, 904–05, 528 P.2d 1232, 1234 (1974).

In the instant action, Smith initially sought relief from the KDHR, and then, presumably dissatisfied with those proceedings, discontinued the administrative process and filed an action in court (which eventually culminated in her count 5 claim). Ordinarily, in light of these facts, we would require exhaustion, as the legitimacy of the KDHR would be diminished were claimants allowed to simply abandon the administrative process mid-stream. Although the legislature provided claimants with initial access to courts, once a claimant has elected to pursue administrative remedies, the rem-

edies should be exhausted before intervention by a court.

■ However, Smith asserts that even if the court would ordinarily require exhaustion, it should not require exhaustion in the instant case because administrative remedies are inadequate. Smith is correct in stating that the court need not require exhaustion where administrative remedies are inadequate. *See Cussimanio v. Kansas City Southern Railway Co.,* 5 Kan.App.2d 379, 385–86, 617 P.2d 107, 113 (1980). She contends that the available administrative remedies are unsuitable because of MCI's failure to comply with the discovery orders of the KDHR. However, the record does not support Smith's position. The KDHR clearly stood prepared to proceed with Smith's claim. She further asserts that administrative remedies are inadequate because the KDHR cannot award punitive damages; however, punitive damages are not recoverable in this court on counts 3 and 5. *See Holder v. Kansas Steel Built, Inc.,* 224 Kan. 406, 414, 582 P.2d 244, 251 (1978) (punitive damages are not recoverable on a count 5–type claim).

■ In sum, were the court's focus merely on the two contract claims in counts 3 and 5, we would not hesitate to require exhaustion. However, in determining whether to exercise our discretion to require exhaustion, we must remain mindful of the practical effects of our decision. Were we to dismiss counts 3 and 5, Smith would likely take one of two courses: (1) She would pursue her contract claims before the KDHR at the same time she litigated her RICO and fraud claims before this court, or (2) she would litigate her RICO and fraud claims in this forum, reassert her contract claims with the KDHR if she was dissatisfied with the results of the litigation of the RICO and fraud claims, and possibly, return to court after exhausting the administrative process. In other words, requiring exhaustion could result in Smith and MCI proceeding in two or three forums, rather than one, to resolve their dispute. The court is unwilling to reach

this result, and thus we decline to exercise our discretion to require exhaustion.

█ MCI further asserts that the court should decline to exercise pendant jurisdiction over count 5. However, all of the claims arise from the same nucleus of operative facts, and, as indicated above, we believe that it is reasonable to litigate all of the claims in one proceeding. *See United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed. 2d 218 (1986).

Thus, we will allow Smith to proceed in this court on counts 3 and 5 of her first amended complaint, and we will therefore deny MCI's motions to dismiss those counts. Given this ruling, we must now consider Smith's motion to certify a class as to count 5.

### B. *Smith's Motion for Certification of a Class for Count 5.*

█ Smith moves for certification of the following class on count 5 of her first amended complaint:

All persons who were employed by defendant MCI Telecommunications Corporation at defendant's Overland Park, Kansas office to sell commercial long-distance communications services and products from the adoption of defendant's "Commercial Sales Force Plan" on May 1, 1984 to the present date and whose employment with defendant has been terminated either voluntarily or involuntarily.

The law regarding class certification requirements is adequately addressed above in section II. The proposed count 5 class contains at least 90 members, and therefore the numerosity requirement of Rule 23(a)(1) is met.

█ The commonality requirement of Rule 23(a)(2) is also met. All of the proposed class members were employed at the Overland Park, Kansas, office, were terminated, and were subject to the same provision in the plans. Common questions of law and fact exist.

█ The typicality requirement of Rule 23(a)(3) is also satisfied. Smith was employed in the Overland Park, Kansas, office, terminated, and subject to the same compensation plan as the proposed class members. Thus, she suffered the same type harm as suffered by the members of the proposed class. Further, MCI's argument that Smith is not typical of the proposed class because of her failure to exhaust is without impact given our holding in section III, subsection A.

The adequacy requirement of Rule 23(a)(4) is also met. Smith's counsel is qualified and Smith's interests are not antagonistic to those of the proposed class.

[30] Finally, the court finds that common questions of law and fact predominate over individual questions, and that a class action is superior to other available methods of adjudicating this controversy. *See* Fed.R.Civ.P. 23(b)(3). The court will therefore certify the proposed class on count 5 of Smith's first amended complaint.

### IV. *MCI's Motion to Review the Magistrate's Orders.*

█ MCI moves the court to review Magistrate Rushfelt's orders dated June 29, 1988, and September 26, 1988. *See* Fed.R.Civ.P. 72(a); D.Kan.Rule 604(a). In these orders, the magistrate compelled production of certain documents which MCI contends are not properly subject to discovery. Smith asserts that MCI's objections regarding the documents were untimely, and that the magistrate's orders should not be set aside.

On March 30, 1987, Smith served her first request for production of documents, including Document Request 35. Document Request 35 seeks "[a]ll records of any investigation by Diana Francis regarding plaintiff, Stan Rejniak or Phil Rosatone." Diana Francis (Francis) was an MCI attorney. On May 18, 1987, MCI filed a motion to stay discovery pending the court's ruling on MCI's motion to dismiss, filed on the same date. On July 6, 1987, MCI again filed a motion to stay discovery pending the court's ruling on MCI's motion to dismiss the first amended complaint, filed on the same date.

On October 15, 1987, the magistrate denied MCI's motion to stay discovery. The order set no deadlines for MCI's responses

to outstanding discovery requests. MCI eventually served its response to Smith's request for production of documents on December 28, 1987. In response to Document Request 35, MCI stated:

MCI objects to Document Request 35 which seeks documents pertaining to Diana Francis' investigation on the basis that such request is irrelevant to any issue in this case and is not reasonably calculated to lead to the discovery of admissible evidence. This request, if relevant at all, relates to issues in plaintiffs' Title VII case, not this case.

MCI further objects to Document Request 35 on the basis that such documents are protected by the attorney-client privilege and attorney work-product doctrine.

Smith filed a motion to compel which addressed, among other items, Document Request 35; MCI filed a motion for a protective order which addressed Document Request 35. On June 29, 1988, the magistrate denied MCI's motion and granted Smith's motion to compel, holding that MCI's responses and the objections therein, filed some seventy-four (74) days after the magistrate's order denying MCI's motion to stay discovery, were not timely produced. In effect, the magistrate determined that MCI's responses were due after the magistrate's order denying the motion to stay discovery, although that order did not specifically set forth discovery deadlines.

MCI filed a motion for reconsideration of the magistrate's June 29, 1988, order. On September 26, 1988, the magistrate denied the motion for reconsideration, stating:

Although its objection [to Document Request 35] was untimely, [MCI] now asks the court to exercise its discretion to reconsider and deny the motion to compel, if the requested material is indeed privileged or work product. The court denies the motion, primarily because the issue could have been raised and fully briefed when the court handed down its June 29, 1988, order. The question of whether the court should exercise its discretion and thereby review on its merits the original motion to compel is generally not an appropriate subject for a motion for reconsideration.... The

real question now is not whether this court should exercise the discretion which defendant seeks, but whether newly discovered evidence has been presented or manifest errors of law or fact are present in the motion. In this case that question must be answered in the negative. The authority in this district and circuit hold privilege objections are waived if the objection is untimely....

[MCI] has cited no cases from this district or circuit which address the issue of what circumstances justify ignoring an untimely objection. The cases MCI cited from other districts are distinguishable.

(Citations omitted.) MCI now seeks review of the June 29, 1988, and September 26, 1988, orders of the magistrate.

In reviewing the magistrate's orders, the court must determine whether the orders are "clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A); *see also Devore & Sons, Inc. v. Aurora Pacific Cattle Co.*, 560 F.Supp. 236, 239 (D.Kan.1983). MCI advances two basic arguments in support of its motion to review. First, it asserts that its responses and objections were not untimely because the magistrate's October 15, 1987, order, which caused discovery to resume by denying MCI's motion to stay discovery, did not set forth specific deadlines for MCI's responses to outstanding discovery requests. We find this assertion to be entirely without merit. MCI asserts that Federal Rule of Civil Procedure 26(c) requires that the magistrate set forth discovery deadlines when he denies a motion to stay. The rule, which states that "the court may, on such terms and conditions as are just, order that any party or person provide or permit discovery," clearly does not include such a requirement. Further, MCI's assertion that it was entirely without direction as to the timing of discovery responses is implausible in light of Rule 34(b), which specifically provides a thirty (30) day period for responses to requests for production. In sum, the court rejects MCI's argument that its responses were not untimely.

Second, MCI asserts that even if its responses and objections were untimely, the

magistrate should have considered the objections. Ordinarily, the magistrate's rulings dated June 29, 1988, and September 26, 1988, would be summarily affirmed by this court. However, MCI's second argument has given the court pause because of the unique nature of the materials which Smith seeks to discover. Smith seeks discovery of all of the records which Francis, an MCI attorney, compiled during her investigation regarding Smith; these records are almost certain to include materials which are attorney work product or are subject to an attorney-client privilege.[15] Because of this, the court is forced to balance and choose between two competing principles: the deference to be given to the decisions of the magistrate, especially where those decisions involve control of his busy calendar, and the tenet, embodied in the Federal Rules of Evidence and numerous court decisions, that parties should not be compelled to produce for use by their adversaries materials of this sort (attorney work product and documents subject to the attorney-client privilege).

On one hand, the non-dispositive decisions of the magistrate should be afforded significant deference. *See* 28 U.S.C. § 636(b)(1)(A) (setting forth the clearly erroneous standard for nondispositive orders); Fed.R.Civ.P. 72(a) (same); D.Kan. Rule 604 (adopting the Rule 72(a) standards). This is especially true in matters involving discovery. In this court, the magistrate is charged with the determination of all pretrial, procedural, and discovery motions until a matter has been pre-tried. *See* D.Kan.Rule 602(b). Just as the Tenth Circuit allows this court great freedom to control its docket, *see Snead v. C.I.R.*, 733 F.2d 719, 720 (10th Cir.1984) ("[c]ourts have the inherent power to impose a variety of sanctions on both litigants and attorneys in order to regulate their docket, promote judicial efficiency, and deter frivolous filings"), we must allow the magistrate significant freedom in controlling the pretrial docket of this court.

On the other hand, the end result of a case, including the course of discovery, is the responsibility of this court. In the instant case, enforcement of the magistrate's orders would result in Smith acquiring information to which, under our adversarial judicial system, she would ordinarily be denied access. Justice Jackson commented aptly on the work product doctrine:

> [A] common law trial is and always should be an adversary proceeding. Discovery was hardly intended to enable a learned profession to perform its functions either without wits or on wits borrowed from the adversary.... I can conceive of no practice more demoralizing to the Bar than to require a lawyer to write out and deliver to his adversary an account of what witnesses have told him.

*Hickman v. Taylor*, 329 U.S. 495, 516, 67 S.Ct. 385, 396, 91 L.Ed. 451 (1947) (Jackson, J., concurring). The attorney-client privilege has evoked similar comments from the Supreme Court:

> The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law. Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice. The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client.

*Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981).

■ Having considered the competing principles, the court is of the opinion that the interests embodied in the work product doctrine and the attorney-client privilege are paramount. Thus, the magistrate should have considered the merits of MCI's

---

**15.** The court analyzes the issue of whether the materials are work product or privileged below. However, we note that in her memorandum opposing MCI's motion to review, Smith does not address the issue of whether the materials sought would be discoverable if MCI's objec- tions were timely. This indicates that Smith agrees that the materials would not ordinarily be discoverable. In any event, at this point, we will assume that the materials would not be discoverable if MCI had timely objected to Smith's request.

objections, in spite of the fact that the objections were untimely. *See Metros v. United States District Court for the District of Colorado,* 441 F.2d 313, 318 (10th Cir.1970) (a court may, in its discretion, consider the merits of an objection even if the objection is untimely). *In this specific action,* we will therefore set aside the magistrate's orders and review the merits of MCI's objections. *See Abels v. Murjani International, Ltd.,* No. 83–1546, slip op. at 3–4 (D.Kan., *unpublished,* Dec. 30, 1985) (where Judge Theis, with reluctance similar to this court's, set aside an order of the magistrate pertaining to discovery matters).

■ Attorney work-product documents may be discovered by a party only upon a showing that the party has substantial need of the materials and cannot otherwise obtain the substantial equivalent of the materials without undue hardship. Fed.R.Civ. P. 26(b)(3). MCI has the burden of establishing that the information sought is protected by Rule 26(b)(3), *Barclaysamerican Corp. v. Kane,* 746 F.2d 653, 656 (10th Cir.1984), and if the information is protected, Smith has the burden of proving substantial need and undue hardship. *Bethany Medical Center v. Harder,* No. 85–2415, slip op. at 10 (D.Kan., *unpublished,* March 12, 1987) [1987 WL 47845].

■ The attorney-client privilege protects " 'confidential communications by a client to an attorney made in order to obtain legal assistance' from the attorney in his capacity as a legal advisor." *Matter of Grand Jury Subpoena Duces Tecum (Dorokee Company),* 697 F.2d 277, 278 (10th Cir.1983) (quoting *Fisher v. United States,* 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1976)). The privilege is applicable to the discussions an attorney has with the employees of a corporate client. *Upjohn,* 449 U.S. at 390–94, 101 S.Ct. at 683–85. MCI has the burden of

establishing that the information Smith seeks is subject to the attorney-client privilege. *Barclaysamerican Corp. v. Kane,* 746 F.2d at 656.

■ The court has examined all of the records compiled by Francis and requested by Smith. The materials are notes that Francis made while interviewing MCI employees or former employees in connection with this action and a separate discrimination claim filed by Smith against MCI. First, all of Francis' notes meet the definition of work product, as they are tangible documents prepared by MCI in preparation for litigation. *See* Fed.R.Civ.P. 26(b)(3); *Hickman,* 329 U.S. at 511, 67 S.Ct. at 393. As to the notes, Smith has not proved substantial need and undue hardship. Second, the notes made while Francis was interviewing MCI employees are subject to the attorney-client privilege, and are thus "doubly non-discoverable."

In summary, the court is of the opinion that given the nature of the documents which Smith seeks to discover, the magistrate should have considered the merits of MCI's objections, even though the objections were untimely. The court therefore will set aside the magistrate's orders, and after considering the merits of MCI's objections, we grant MCI's motion for a protective order and deny Smith's motion to compel as to Document Request 35. However, we reiterate the reluctance with which we enter this order and invade the domain of the magistrate; were it not for the nature of the materials which Smith requests, we would summarily affirm the magistrate's decision.[16] Finally, we admonish MCI's counsel for failing to properly monitor the flow of discovery in this matter. Had MCI timely produced its answers and objections to Smith's requests for production of documents, significant time and expense could have been avoided by the court and by the parties.[17]

16. In fact, we wish to explicitly state that this portion of the court's order is, in our opinion, of little or no precedential value. By no means are we inviting other litigants to move this court to reconsider the magistrate's numerous discovery orders denying objections which are untimely asserted. Our practice will remain to

summarily deny such motions in all but the most unusual instances.

17. Were it not for MCI's inattentiveness, only two motions would likely have been filed (Smith's motion to compel and MCI's motion for a protective order), and only one order would probably have been entered (the magis-

### V. *Summary.*

In summary, the court considers MCI's motion for reconsideration of that portion of our order dated December 17, 1987, directed at count 1 of Smith's first amended complaint as a motion to dismiss, and we deny the motion. We will certify the proposed class with respect to counts 1, 2, and 3. Further, we deny MCI's motions to dismiss counts 3 and 5, and we grant Smith's motion for certification of a class as to count 5. Finally, we overrule the magistrate's orders regarding discovery of the notes of Francis, and we hold that the notes are not discoverable.

IT IS THEREFORE ORDERED that MCI's motion for reconsideration of our order dated December 17, 1987, *see* 678 F.Supp. 823, is considered by the court as a motion to dismiss, and the motion is denied.

IT IS FURTHER ORDERED that Smith's motion for certification of a class as to counts 1, 2, and 3 of her first amended complaint is granted.

IT IS FURTHER ORDERED that MCI's motion to dismiss count 3 is denied.

IT IS FURTHER ORDERED that MCI's motion to dismiss count 5 is denied.

IT IS FURTHER ORDERED that Smith's motion to certify a class as to count 5 is granted.

IT IS FURTHER ORDERED that MCI's motion for review of the magistrate's orders regarding discovery of the notes of Francis is granted; we grant MCI's motion for a protective order and deny Smith's motion to compel.

---

trate's order addressing the merits of MCI's objections). Instead, five motions (along with the attendant responses and replies) have been filed (Smith's motion to compel, MCI's motion for a protective order, MCI's motion for the magistrate to reconsider his order, MCI's motion for the magistrate to stay application of his order, and MCI's motion for this court to review the magistrate's order), and four orders have been entered (the magistrate's June 29, 1988, order compelling discovery, the magistrate's September 26, 1988, order denying reconsideration, the magistrate's October 31, 1988, order staying application of his earlier orders, and this portion of the instant order).